**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN
GRAND RAPIDS DIVISION**

| | |
|---|---|
| **JASON ICKES, voter** | |
| **KEN BEYER, voter** | |
| **MACOMB COUNTY REPUBLICAN PARTY by its officers of the Executive Committee,** | **Civil Action No. : _____** |
| | **JURY DEMAND** |
| **DONNA BRANDENBURG, US Tax Payers Candidate for the 2022 Governor of Michigan,** | |
| **ELECTION INTEGRITY FUND AND FORCE, a Michigan non-profit corporation, AND** | |
| **SHARON OLSON, in her official capacity as the Clerk of Irving Township Barry County** | |
| **Plaintiffs,** | |
| **v.** | |
| **GRETCHEN WHITMER, in her official capacity as the Governor of Michigan, and** | |
| **JOCELYN BENSON, in her official capacity as Michigan Secretary of State** | |
| **Defendants.** | |

**Daniel J. Hartman (P52632)**
**Attorney for Plaintiffs**
**PO BOX 307**
**Petoskey, MI 49770**
**(231) 348-5100**
**Danjh1234@yahoo.com**

1

**Russell Newman A. Newman TN BRP#033462**
**Co-counsel for Plaintiff Jason Ickes**
**Application for admission forthcoming**
**253 S. Tamiami Suite 120**
**Nokomis, FL 34275**
**(615) 544-1510**
**russell@thenewmanlawfirm.com**

## VERIFIED COMPLAINT

NOW COMES Plaintiffs and, pursuant to 28 U.S.C. § 2201, 52 U.S.C. § 20705, 42 U.S.C. § 1983, and MCLA § 168.46, and hereby files this Verified Complaint and requests that this Honorable Court declare the rights, status and/or legal relations between the parties, enjoin and/or restrain The State of Michigan from destroying 2020 presidential election evidence, award damages in an amount to be determined by a jury and issue an Order compelling the Michigan Governor and Michigan Secretary of State to decertify the 2020 presidential election and, in support thereof, Plaintiff would show unto the Court the following:

### I.    PARTIES

1.    Plaintiff Jason Ickes is a citizen of Michigan who voted in the 2020 presidential election in Michigan and he is domiciled in Jenison, Ottawa County, Michigan.

2.    Plaintiff Ken Beyer is a citizen of Michigan who voted in the 2020 presidential election and is domiciled in Allegan County, Michigan.

3.    Plaintiff Macomb County Republican Party is a county political party that elected an executive committee for Macomb County as defined by MCL 168.599 which selected its chair Mark Forton and the officers of Macomb County who join this action in both their official capacity and as voters in the 2020 Presidential Election. They are residents of Macomb County, Michigan.

2

4.      Plaintiff Donna Brandenburg is a candidate for Michigan governor for the US Taxpayers party and on the ballot on November 8, 2022, and was a voter in the 2020 Election

5.      Plaintiff Election Integrity Fund and Force is a Michigan non-profit organization that is concerned as a non-partisan community activist organization dedicated to having accurate, honest elections in Michigan.

6.      Plaintiff Sharon Olson is the duly elected Clerk for Irving Township, Barry County Michigan, and responsible by statute for conducting the 2020 and 2022 elections.

7.      On November 23, 2020, Defendant Gretchen Whitmer was the Governor of the State of Michigan and she unlawfully certified Michigan's 2020 presidential election results. (Michigan's 2020 presidential election certification attached hereto as Exhibit 1).

8.      On November 23, 2020, Defendant Jocelyn Benson was the Secretary of State of the State of Michigan and she unlawfully certified Michigan's 2020 presidential election results.

## II.      JURISDICTION AND VENUE

9.      This verified Complaint is filed pursuant to 28 U.S.C. § 1331 and seeks damages pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's constitutional right to vote, as provided for by the Fourteenth Amendment to the Constitution of the United States.

10.     This verified Complaint is also filed pursuant to 28 U.S.C. § 2201 *et seq.* to 2201 "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201.

11.     This verified Complaint is also filed pursuant to 52 U.S.C. § 20705 and requests that this Honorable Court issue a temporary restraining order to stop the Defendants from destroying critical evidence from Michigan's 2020 presidential election.

### III. FACTUAL ALLEGATIONS

12.     On November 3, 2020, Michigan attempted to conduct an election for President of the United States of America.

13.     However, as presented *infra*, the Defendants, Gretchen Whitmer and Jocelyn Benson, did not have the legal authority to certify Michigan's 2020 presidential election.

14.     Pursuant to the Constitution of the United States, "Each State shall appoint, **in such Manner as the Legislature thereof may direct, a Number of Electors**, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector." U.S. Const. art. II, § 1, cl. 2 (emphasis added).

**A. The Electronic Voting System used in 2020 including the Election Management Software and Hardware (including ALL three (3) types of tabulators and the high-speed scanners (Machines) that were used in the 2020 presidential election in Michigan were not certified or accredited in accordance with to MCL 168.795a**

15.     Pursuant to Michigan law, "an **electronic voting system SHALL NOT BE USED in an election"** unless it meets certain requirements.

**168.795a Electronic voting system; approval by board of state canvassers; conditions; approval of improvement or change; inapplicability of subsection (1); intent to purchase statement; instruction in operation and use; disapproval.**

(1) An electronic voting system **shall not be used** in an election unless it is approved by the board of state canvassers as meeting the requirements of sections 794 and 795 and instructions regarding recounts of ballots cast on that electronic voting system that have been issued by the secretary of state, unless section 797c has been complied with, and **unless it meets 1 of the following conditions**:

  (a) Is certified by an independent testing authority accredited by the national association of state election directors and by the board of state canvassers.

  (b) In the absence of an accredited independent testing authority, is certified by the manufacturer of the voting system as meeting or exceeding the performance and test

standards referenced in subdivision (a) in a manner prescribed by the board of state canvassers.

16.     Michigan provided the following definition at MCLA 168.704(f)

(f) "Electronic voting system" means a system in which votes are recorded and counted by electronic tabulating equipment.

17.     Michigan provided the following definition at MCLA 168.704(e)

(e) "Electronic tabulating equipment" means an apparatus that electronically examines and counts votes recorded on ballots and tabulates the results.

18.     After the Electronic voting system is approved any changes to the system

especially the software must also be approved pursuant to MCL 168.795a(6)

> (6) After an electronic voting system is approved, an improvement or change in the electronic voting system shall be submitted to the board of state canvassers for approval pursuant to this section. This subsection does not apply to the technical capability of a general purpose computer, reader, or printer to electronically record and count votes.

19.     On information and belief, the electronic voting system software that was used

in the 2020 election was not certified either by an independent testing authority which was

accredited by the national association of state electors AND the board of state canvassers

20.     On information and belief, the electronic voting system software that was used

in the 2020 election was not certified by the manufacturer of the voting system as meeting or

exceeding the performance and test standards of the board of state election directors in a

manner prescribed by the board of state canvassers.

21.     Pursuant to MCL 168.795a, some additional pre-requisites for use in a

Michigan election include mandatory compliance with:

> a.  MCL 168.794 http://legislature.mi.gov/doc.aspx?mcl-168-794
>
> b.  MCL 168.795 http://legislature.mi.gov/doc.aspx?mcl-168-795
>
> c.  MCL 168.797(c) http://legislature.mi.gov/doc.aspx?mcl-168-797c

**B.     The Laboratory used to certify the Electronic Voting Systems was not authorized to perform testing and certification by the Help America Vote Act of 2002 as required by Michigan law.**

22.     Pursuant to Michigan law, "the **Secretary of State is responsible for the coordination of the requirements imposed under** this chapter, the national voter registration act of 1993, and **the Help America Vote Act of 2002**" M.C.L.A. § 168.509n (emphasis added).

23.     The requirement in Michigan Law MCLA 168.509n that directs the Michigan Secretary of State to comply with the Help America Vote Act of 2002 was effective on October 29, 2002.

24.     The Help America Vote Act of 2002 created "the Election Assistance Commission" and the Election Assistance Commission (EAC) is referred to in the Act as the "Commission." 52 U.S.C. § 20921 (formerly cited as 42 U.S.C. § 15321.

25.     The Election Assistance Commission "shall serve as a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of Federal elections by -- ... **(2)** carrying out the duties described in part B of this subchapter (relating to the testing, certification, decertification, and recertification of voting system hardware and software)...." 52 U.S.C. § 20922 (formerly cited as 42 U.S.C. § 15322).

26.     The Election Assistance Commission "shall provide for the testing, certification, decertification, and recertification of voting system hardware and software **by accredited laboratories.**" 52 U.S.C. § 20971(a)(1) (formerly cited as 42 U.S.C. § 15371) (emphasis added).

27.     Additionally, at "the option of a State, the State may provide for the testing, certification, decertification, or recertification of its voting system hardware and software **by the laboratories accredited by the Commission** under this section." 52 U.S.C. § 20971(a)(2) (for Pursuant to the U.S. Election Assistance Commission, there are **only two Voting System Test Laboratories (VSTL) that are accredited** by the Election Assistance Commission: (1) **Pro V&V**; and (2) SLI Compliance. U.S. Election Assistance Commission, VOTING SYSTEM TEST LABORATORIES (VSTL), https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl (last visited June 21, 2022) (emphasis added) merely cited as 42 U.S.C. § 15371) (emphasis added).

28.     Michigan has expressly opted into compliance with 52 USC 2097 with MCL 168.509a.

**MICHIGAN HAS ELECTRONIC VOTING SYSTEMS IN USE BY COUNTIES THAT ARE NOT CERTIFIED AND SOME OF THESE WERE CERTIFIED BY AN UNACCREDITED LABORATORY.**

29.     Michigan has 83 counties that all had the option to select the electronic voting system from the three choices provided by the Michigan Secretary of State.

30.     A startling twenty-four (24)  counties do not have a certified system pursuant to the information presented at https://www.eac.gov/voting-equipment/system-certification-process (last visited August 31, 2022).

31.     This is almost 29% of the counties do not use a certified system.

32.     Pursuant to the EAC website, eleven (11) Counties used Hart Verity 2.2.2. which was also certified. https://www.eac.gov/voting-equipment/system-certification-process (last visited August 31, 2022).

33.     Pursuant to the EAC website, forty-eight (48) counties use Dominion's D-Suite 5.5. https://www.eac.gov/voting-equipment/system-certification-process (last visited August 31, 2022).

34.     The Dominion Election Management system was used in more than 57% of the Michigan counties

35.     Pursuant to the Michigan Secretary of State, the Dominion election voting systems used in the November 3, 2020 presidential election were "certified" on November 15, 2019, with an EAC System ID # as follows: DVS-DemSuite5.5-B. Michigan Secretary of State, Certified Vote Tabulating Equipment as of July 22, 2020.

36.     The software version that was certified reports as version 5.5-B while the website indicates that the counties were certified for use in version 5.5.

37.     Regardless, these forty-eight (48) counties appear to have relied upon the validity of the November 15, 2019 certification and the laboratory that performed the testing.

38.     Pursuant to the Michigan Secretary of State, the Dominion election voting systems used in the November 3, 2020 presidential election were "certified" on November 15, 2019, with an EAC System ID # as follows: DVS-DemSuite5.5-B. Michigan Secretary of State, Certified Vote Tabulating Equipment as of July 22, 2020.

**ACCREDITATION ISSUE**

39.     Pursuant to the Michigan Secretary of State's website and hyperlink in the above PDF, DVS-DemSuite5.5 is manufactured by Dominion Voting Systems Corp and the Testing Laboratory was Pro V&V. U.S. Election Assistance Commission, https://www.eac.gov/voting-equipment/democracy-suite-55 (last visited August 29, 2022).

8

40.     Pursuant to the U.S. Election Assistance Commission's website, Pro V&V received a Certificate of Accreditation on February 24, 2015.



41.     There is no evidence of that PRO V and V was recertified.

42.     Pursuant to Version 2.0 of the Voting System Test Laboratory Program Manual, which was effective May 31, 2015, "A grant of accreditation is valid for a period **not to exceed two years**." Voting System Test Laboratory Program Manual, p. 39, § 3.8.

43.     On November 15, 2019, the Pro V & V Accreditation was lapsed by more than two years.

44.    On November 15, 2019, Pro V&V was not accredited by the U.S. Election Assistance Commission. U.S. Election Assistance Commission, https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl/pro-vv (last visited August 29, 2022).

45.    Pro V&V did not receive another Certificate of Accreditation until **January 27, 2021**, which was after the 2020 presidential election.

46.    Since Michigan law expressly requires that the "requirements imposed under… the Help America Vote Act of 2002," the Michigan voting machines or devices must have been tested and approved by a laboratory that was accredited pursuant to the Help America Vote Act of 2002

47.    However, Pro V&V was not even accredited on November 3, 2020, as a laboratory in addition to having expired accreditation on the day of November 15, 2019, when they claimed to certify the Dominion system

1. **THE PROBLEM WITH THE ELECTRONIC VOTING SYSTEMS CERTIFICATION**

48.    The US Election Assistance Commission certifies electronic voting systems to the federal standards and has issued three versions of the standards for electronic voting systems which are version 1.0; 1.1 and 2.0. Certified Voting Systems | U.S. Election Assistance Commission (eac.gov)

49.    The electronic voting systems include the hardware and software that is used as described in the Michigan Election code which includes the three vendors each offering different types of tabulators and the election management system software.

50.    The requirement to also comply with the additional requirements of the Help America Vote Act of 2002 was passed into Michigan law on October 29, 2002.

51.     The essential components of the electronic voting systems include the election management software that accumulates the precinct votes at the county level and the tabulators that read the ballots and count the votes at a precinct level.

### a.  TABULATORS

52.     On information and belief, none of the counties in Michigan used an electronic voting system that was are properly certified by the US Election Assistance Commission that are in use in Michigan.

53.     On information and belief, none of the counties in Michigan used an electronic voting system that was properly certified by the US Election Assistance Commission.

54.     On information and belief, all of the counties in Michigan intend to use an electronic voting system that was does not meet or exceed the current standards of the US EAC which is VVSG 2.0 from 2021.

55.     On information and belief, many, if not all, of the counties in Michigan electronic voting systems used in the 2020 Michigan Presidential election were not certified to the standards of the US EAC VVSG 1.1 from 2009.

56.     On information and belief, many, if not all, of the counties in Michigan electronic voting systems used in the 2020 Michigan Presidential election were not certified to the standards of the US EAC VVSG 1.0 from 2005.

### b. ELECTION MANAGEMENT SOFTWARE VVSG 2.0

57.     The November 15, 2019 "certification" that was presented above for fifty-nine (59) of the eighty-three (83) counties in Michigan was to the VVSG 1.1 standard from 2009.

58.     On information and belief, the current election management software used does not meet the current standards of the US EAC which is VVSG 2.0 from 2021.

59.     The scheduled 2022 General Election will therefore use machines that are not certified to the current standards unless this court enforces the law that requires the machines comply.

## 2.  SECURITY PROTECTIONS REQUIRED

60.     VVSG 2.0 was "designed to meet the challenges ahead, to replace decade's old voting system standards, to improve the voter experience, and provide necessary safeguards to protect the integrity of the voting process." EAC Testing and Certification Program.

61.     The new upgraded requirements in VVSG 2.0 included security features:

a.   Software independence is a requirement. A software independent voting system does not rely solely on software and an undetected change or error in its software cannot cause an undetectable change or error in an election outcome. This includes the use of paper ballots, cryptographically verifiable (E2E) ballots, access controls, encryption, physical security, logging, and auditing.

b.   Wireless systems are disallowed. Voting systems are not allowed to connect wirelessly to external networks. Unused ports and processes must be removed or disabled. Accessibility is provided for by allowing the use of Bluetooth adapters connected to the voting device's headphone jack as this does not increase the attack surface of the system. The use of firewalls, intrusion prevention, and other means is recommended in the requirements.

    c.   Physical security includes logically disabling physical ports that are not essential to voting operations. All new connections and disconnections must be logged.

    d.   Multi-factor authentication is required for all critical operations such as software updates, aggregating and tabulating votes, enabling network functions, changing device states (opening/closing polls), or modifying authentication mechanisms.

    e.   System integrity requires risk assessment and supply chain risk management strategy, removes non-essential services, requires exploit mitigation (e.g., address space layout randomization (ASLR), data execution prevention) and the system to be free of known vulnerabilities, cryptographic boot validation, and authenticated updates.

    f.   Data protection requires FIPS 140-2 validated cryptographic modules (except E2E), cryptographic protection of various election artifacts and digitally signed cast vote records and ballot images

62.    Compliance with an outdated standard does not provide for a secure safe election.

## CONSEQUENCE OF NON-COMPLAINCE

63.    Since the electronic voting systems were used in violation of Michigan law, then said election is void *ab initio,* and said 2020 election cannot be certified by any of the Defendants.

64.     Since the Dominion Democracy Suite 5.5 has been not tested and approved by a laboratory that is "accredited" pursuant to the Help America Vote act of 2002 to the standards of the VVSG 1.0 or 1.1, the use said voting machine in the 2020 election was illegal. These forty eight counties can not use their electronic tabulators or election management software in the November 8, 2022 election or any further election until they comply with the law

65.     The E S and S systems or whatever version is being used in the twenty-four (24) other systems

66.     Since NONE of the electronic voting systems used by the counties in Michigan in 2022 are not compliant with the new VVSG 2.0 and tested and approved by a laboratory for use in the 2022 Michigan General Election on November 8, 2022 then the systems MUST not be used.

**The 2020 Election cannot be certified.**

67.     Void *ab initio* is defined as "Having no legal effect from inception." Thompson Reuters Practical Law, definition of "*Void ab initio*" last visited June 21, 2022 ([https://1.next.westlaw.com/Glossary/PracticalLaw/I41334c8d07ef11ebbea4f0dc9fb69570?contextData=(sc.Default)&firstPage=true&transitionType=Default](https://1.next.westlaw.com/Glossary/PracticalLaw/I41334c8d07ef11ebbea4f0dc9fb69570?contextData=(sc.Default)&firstPage=true&transitionType=Default))

68.     Void *ab initio* means that the action taken is **void**; it is **not voidable**. *See id.*

69.     Void *ab initio* means that the action taken "has no legal effect." *Id.*

70.     "A void action cannot be ratified or validated [or certified]." *Id.*

71.     "An action that is void *ab initio* **never had any legal effect**." *Id* (emphasis added).

72.     In order for Michigan to conduct a valid election, the Michigan Secretary of State must comply with the requirements contained in M.C.L. § 168.795 and M.C.L. § 168509n *et seq*. as well as the requirements contained within the Help America Vote act of 2002 which is 52 U.S.C. § 20921.

73.     Since the legal requirements contained in M.C.L. § 168.795; M.C.L. § 168509n *et seq*. and the Help America Vote Act of 2002 were not met, then the Michigan Secretary of State and Governor had no authority to use any voting machine or device in violation of said statutes.

74.     Since the legal requirements contained in M.C.L. § 168.795; M.C.L. § 168509n *et seq*. and the Help America Vote Act of 2002, then the Michigan Secretary of State and Governor had no authority to certify the results of Michigan's 2020 presidential election and their certification signatures are void *ab initio*.

75.     As such, Michigan conducted an **<u>unlawful and illegal</u>** presidential election, which the Michigan Secretary of State and Governor could not lawfully certify.

76.     As such, Defendant Gretchen Whitmer's certification of Michigan's 2020 presidential election was/is **<u>void *ab initio*</u>** as she did not have the requisite authority under Michigan law to certify said election.

77.     Defendant Jocelyn Benson's certification of Michigan's 2020 presidential election was/is **<u>void *ab initio*</u>** as she did not have the requisite authority under Michigan law to certify said election.

78.     As such, it is incumbent upon this Court to issue a writ mandamus ordering Defendant Jocelyn Benson, in her official capacity as the Michigan Secretary of State, and

Defendant Gretchen Whitmer, in her official capacity as the Michigan Governor to decertify Michigan's 2020 presidential election results.

79.     It is further incumbent upon this Court to issue a writ of mandamus ordering the Defendants to re-run the 2020 presidential elections *instanter* as the purported election conducted on November 3, 2020, was/is **void *ab initio*** and said election is uncertifiable.

80.     Plaintiffs all assert a constitutional right to participate in Michigan's 2020 presidential election. *See* U.S. Const., Amend. 14.

81.     Michigan's failure/refusal to comply with M.C.L.A. § 168.795a and 52 U.S.C. § 20901 *et seq*. violates Plaintiff's constitutional right to vote and said actions are actionable pursuant to 42 U.S.C. § 1983.

82.     Pursuant to <u>Bush</u> v <u>Gore</u>, 531 US 98 (2000), a voter has an equal protection right to 1) access to the polls 2) to have the vote counted as cast (not altered) and 3) to not be diluted.

83.     Pursuant to 52 U.S.C. § 20701, the Defendants are required to retain and preserve all records and papers relating to Michigan's 2020 presidential election.

84.     Pursuant to MCL 168.811 certain records are required to be retained for two years or six years.

> **MCL 168.811 Election returns, records, and applications; preservation; destruction; time.**

Sec. 811.

> All election returns, *including poll lists*, statements, *tally sheets*, absent voters' return envelopes bearing the statement required by section 761, absent voters' records required by section 760, and other returns made by the inspectors of election of the several precincts *must be carefully preserved and may be destroyed after the expiration of 2 years following the primary or election at which the same were used.*

All applications executed under section 523, all voter registration applications executed by applicants under section 497(3) and (4), and *all absent voters' applications must be carefully preserved and may be destroyed after the expiration of 6 years following the primary or election at which those applications were executed*.

85.    Pursuant to the  Federal Prosecution of Election Offenses Seventh Edition May 2007 (Revised August 2007) (justice.gov)The manual called the Federal Prosecution of Election Offenses (8th Edition) the most current edition is found at the link is mislabeled seventh edition above. The manual is from December of 2017:

> The retention requirements of Section 20701 are aimed **specifically at election administrators**. In a parochial sense, these laws place criminally sanctionable duties on election officials. However, in a broader sense, this federal retention law assists election administrators in performing the tasks of managing elections and determining winners of elective contests. It does this by requiring election managers to focus appropriate attention on the types of election records under their supervision and control that may be needed to resolve challenges to the election process, and by requiring that they take appropriate steps to ensure that those records will be preserved intact until such time as they may become needed to resolve legitimate questions that frequently arise involving the election process. [*Fed Prosecution of Election Offenses* at page 89]
>
> Section 20701 does apply to all records generated in connection with the process of registering voters and maintaining current electoral rolls [at page 89]
>
> This statute must be interpreted in keeping with its congressional objective: under Section 20701, *all documents and records that may be relevant to the detection or prosecution of federal civil rights or election crimes must be maintained* if the documents or records were **generated** in connection with an election that included one or more federal candidates. [at page 90]

86.    Electronic records from the election that were generated include but are not limited to audit logs and security logs as well as electronic files of the cast vote records and ballot images.

87.    VVSG 2.0 requires the logging of the "audit trail" and the audit trail is required by MCL 168.794.

88.     Attached are some of the requirements from the VVSG 2.0 which was adopted by the Michigan Legislature in MCL 169.609n when it adopted the Help America Vote Act of 2002 and mandate its voluntary standards into the use of electronic voting machine requirements. See Appendix A

89.     Pursuant to 52 U.S.C. § 20701, Defendants are only required to preserve the evidence for twenty-two (22) months.

90.     11/03/20 + 22 months = 09/03/22

91.     Many records of the 2020 election have yet to be produced despite requests from FOIA, or have been reported lost.

92.     There is no requirement in law ever to destroy or delete these records.

93.     The Court must enter a preservation order for these records until this case is concluded or further order of the court.

94.     Pursuant to 52 U.S.C. § 20705, the United States District Court for the district in which a demand is made pursuant to 52 U.S.C. § 20703 shall have jurisdiction.

95.     As such, this Court has jurisdiction over 52 U.S.C. § 20701 *et seq*. and this Court should grant Plaintiff's Emergency Motion for Temporary Restraining Order until it can be determined the extent to which the evidence preserved pursuant to 52 U.S.C. § 20701 will be needed in the present case.

96.     The Court Should also grant immediate consideration due to the pending expiration of the federal requirement to retain records.

97.     The Court must grant an restraining order, temporary order and a permanent injunction against the use of uncertified machines or the use of machines that are certified by an unaccredited person in ALL future elections.

## DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201

98.     Plaintiff incorporates by reference all paragraphs above as if fully stated herein.

99.     Plaintiff requests a declaratory judgment that the Help America Vote Act of 2002 is constitutional.

## VIOLATION OF CONSTITUTIONAL RIGHTS UNDER 42 USC § 1983

100.     Plaintiff incorporates all prior allegations…

101.     Under 42 USC § 1983 an individual may bring an action against state actors under 42 USC § 1983 for a deprivation of his or her constitutional rights.

102.     A cause of action under 42 USC § 1983 must allege deprivation by a governmental entity, governmental official, or a state actor acting as a governmental entity or official, of rights secured by the United States Constitution.

103.     The right to vote is the fundamental constitutional right held by each individual citizen of the United States and is preservative of all other rights.

104.     Under the First, Ninth, and Fourteenth Amendments, *inter alia*, Plaintiff has a constitutional right to vote for the candidate of his choice, but also the constitutional right not to have his vote diluted, canceled out, and/or nullified by the counting of illegal or false or fraudulent votes and/or by the failure to count legal votes, and or by the certification of fraudulent and/or unverifiable votes. *Reynolds v Sims*, 377 U.S. 533, 555 (1964).

105.     Under the Equal Protection Clause, Plaintiff has a constitutional right to enjoy equal protection of the law and equal treatment in exercising his right to vote; and the constitutional right not to have his vote diluted, canceled out, and/or nullified by the counting

of illegal or false or fraudulent votes and/or by the failure to count legal votes, and or by the certification of fraudulent or unverifiable votes.  Cite equal protection clause; Reynolds, supra.

106.    Due to the failure on the part of Defendants to have ensured certification or otherwise caused to be certified voting machines used in the state of Michigan in the November 2020 election, Plaintiff's vote was diluted, canceled out, and/or nullified.

107.    If the Defendants named herein cause, direct, or otherwise allow the information and data required to be preserved for 22 months under Michigan Law destruction of such will make it impossible to demonstrate that the failure of certification of voting machines, as well as other fraudulent, intentional, grossly negligent, and negligent acts on the part of the Defendants, caused Plaintiff's constitutional rights to be violated as described herein under the stated causes of action available under 42 USC § 1983.

108.    The preservation request  but any 42 USC § 1983 action and the  that defendants' fraudulent, intentional, reckless, grossly negligent, and negligent acts were the proximate cause of deprivation of Plaintiff's constitutional rights as stated herein in the fact that Michigan provides for an audit trail in MCL 168.795k which is a part of the voting franchise and was incorporated into the Michigan Constitution which guaranteed the right of every citizen to request an audit in Article 4 Section H which provides for the  "right to have the results of statewide elections audited, in such a manner as prescribed by law , to ensure the accuracy and integrity of elections. This bears directly on the Equal Protection clause which protects against the altering or dilution of votes

109.    The attached affidavit in support of the ex parte motion for emergency TRO is incorporated herein and constitutes verification of this complaint.

**WHEREFORE,** premises considered, the Plaintiff prays as follows:

1.      That good and adequate service be had on all Defendants;

2.      That this Court grant Plaintiff's Emergency Motion for Temporary Restraining Order to:

      a.  prevent the Defendants from tampering with or otherwise adulterating the property and evidence regarding the 2020 elections;

      b.  prevent the Defendants from obstructing justice, interfering with and/or destroying all investigatory evidence, confidences and privileges relating to Michigan's 2020 presidential election;

3.      That this Court issue a preliminary injunction ordering

      a.  the Defendants to remove any/all election equipment for the 2022 elections that is not certified by an accredited voting system test laboratory; and

      b.  the Defendants to preserve all 2020 presidential election records (electronic or otherwise) indefinitely as the 2020 presidential election is still being investigated.

4.      That this Court issue a writ of mandamus compelling the Michigan Secretary of State and Governor to

      a.  decertify the Michigan's 2020 presidential election and to recall Michigan's Joseph R. Biden presidential electors;

      b.  order the Defendants to work together to rerun the Michigan 2020 presidential election as soon as possible, by way of a special election, with paper ballots only, on a single election **day**, with the votes being counted

by hand, with members of all political parties present to observe, with a public livestream of all vote counting;

c.  An award of damages to be determined by a jury of twelve (12);

d.  An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

e.  A permanent injunction on use of electronic voting machines that are not certified by an accredited laboratory in all future elections.

f.  Such other relief to which the Plaintiffs may show themselves to be entitled.

Respectfully submitted this 2nd day of September 2022.


/s/Daniel J. Hartman                              /s//RUSSELL NEWMAN

Daniel J. Hartman (P52632)              Russell Newman A. Newman*
Law Office of Daniel J. Hartman         TN BRP#033462
Attorney for Plaintiffs                        Attorney for Plaintiff Jason Ickes
PO BOX 307                                       253 S. Tamiami Suite 120
Petoskey, MI 49770                           Nokomis, FL 34275
(231) 348-5100                                  (615) 544-1510
Danjh1234@yahoo.com                    russell@thenewmanlawfirm.com
                                                       *Application to Western District
                                                       Forthcoming

**APPENDIX A: VVSG Standards for Preserving Generated Electronic Records**

10.2.4. B The voting system needs to be constructed so that the security of the system does not rely upon the secrecy of the event logs. It will be considered routine for event logs to be made available to election officials, and possibly even to the public, if election officials so desire. The system will be designed to permit the election officials to access event logs without fear of negative consequences to the security and integrity of the election. For example, cryptographic secret keys or passwords will not be logged in event log records.

11.1 – Access privileges, accounts, activities and authorizations are logged, monitored, and reviewed and modified as needed ensures there are records in case there are errors or incidents that need to be accounted for. The system also prevents logging any voter ID information and prevents the logging capability from becoming disabled or the log entries from being modified. The system provides administrators access to logs, allowing for continuous monitoring and periodic review.

11.1-A – Logging activities and resource access
The voting system must log any access to, and activities performed on, the voting system, including:
1. timestamps for all log entries;
2. all failed and successful attempts to access the voting system; and
3. all events which change the access control system including policies, privileges, accounts, users, groups or roles, and authentication methods.
Discussion
In the event of an error or incident, the user access log can assist in narrowing down the reason for the incident or error.
 • Timestamped log entries will allow for easy auditing and review of access to the voting system.
• Access control logging supports accountability of actions by identifying and authenticating users.
• Groups are a collection of users that are assigned a specific set of permissions. Roles are an
identity that is given specific permissions and can be assigned to a user. Any changes to the permissions assigned to groups and roles should be logged to identify updates to a user's privileges.

11.1-C – Preserving log integrity
The voting system must prevent:
1. the logging capability from being disabled;
2. the log entries from being modified in an undetectable manner; and
3. The deletion of logs; with the exception of log rotation.

Discussion

23

This requirement promotes the integrity of the information logged by ensuring all activities are logged. Additionally, it prevents these abilities from being an option within the user interface.

This requirement promotes the integrity of the information logged by ensuring all activities are not modifiable.

The removal of logs is only appropriate for log rotation, which is when the stored logs are rotated out to create more space for continuous logging. The voting system should be capable of rotating the event log data to manage log file growth. Log file rotation may involve regular (e.g., hourly, nightly, or weekly) moving of an existing log file to some other file name and/or location and starting fresh with an empty log file. Preserved log files may be compressed to save storage space.

12.2-E – Logging enabled and disabled ports

An event log entry that identifies the name of the affected device must be generated when physical ports are enabled or disabled.

Discussion

Logically disabling ports prevents unused ports from being used as a staging point for an attack on the voting system.

Discussion

Whether a port is disabled or not is security relevant, especially once a security incident has occurred, and this information would be useful when determining cause. 12.2-C – Physical port restriction applies to physical restrictions, whereas 12.2-D – Disabling ports discusses logical disabling of ports.