**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MICHIGAN**
**GRAND RAPIDS DIVISION**

| | |
|---|---|
| **JASON ICKES, voter** | |
| **KEN BEYER, voter** | |
| **MACOMB COUNTY REPUBLICAN PARTY by its officers of the Executive Committee,** | **Civil Action No. : _____** |
| | **JURY DEMAND** |
| **DONNA BRANDENBURG, US Tax Payers Candidate for the 2022 Governor of Michigan,** | |
| **ELECTION INTEGRITY FUND AND FORCE, a Michigan non-profit corporation, AND** | |
| **SHARON OLSON, in her official capacity as the Clerk of Irving Township Barry County** | |
| **Plaintiffs,** | |
| **v.** | |
| **GRETCHEN WHITMER, in her official capacity as the Governor of Michigan, and** | |
| **JOCELYN BENSON, in her official capacity as Michigan Secretary of State** | |
| **MICHIGAN BOARD OF STATE CANVASSERS,** | |
| **Defendants.** | |

**Daniel J. Hartman (P52632)**
**Attorney for Plaintiffs**
**PO BOX 307**
**Petoskey, MI 49770**
**(231) 348-5100**
**Danjh1234@yahoo.com**

**Russell Newman A. Newman TN BRP#033462**
**Co-counsel for Plaintiff Jason Ickes**
**Application for admission forthcoming**
**253 S. Tamiami Suite 120**
**Nokomis, FL 34275**
**(615) 544-1510**
**russell@thenewmanlawfirm.com**

## VERIFIED FIRST AMENDED COMPLAINT

NOW COMES Plaintiffs pursuant to 28 U.S.C. § 2201, 52 U.S.C. § 20705, 42 U.S.C. § 1983, and MCLA § 168.46, and hereby files this Verified Complaint and requests that this Honorable Court declare the rights, status and/or legal relations between the parties, enjoin and/or restrain The State of Michigan from destroying 2020 presidential election evidence, award damages in an amount to be determined by a jury and issue an Order compelling the Michigan Governor and Michigan Secretary of State to decertify the 2020 presidential election and, in support thereof, Plaintiff would show unto the Court the following:

## I.  PARTIES

1.      Plaintiff Jason Ickes is a citizen of Michigan who voted in the 2020 presidential election in Michigan and he is domiciled in Jenison, Ottawa County, Michigan.

      a.  Jason Ickles declares that he has suffered a particularized, individualized harm in that he through counsel has requested information by FOIA that has not been provided and has been reported as not being preserved.

      b.  Further, Jason Ickes has reviewed affidavits, summary reports and other evidence including evidence from expert witnesses that shows that some

2

votes in the Presidential Election are not counted as cast, that votes reported by voters have been removed and that votes cast in person are reported as cast by absentee with fictitious records demonstrating a ballot was mailed and returned.

    c. As the ballot process in Michigan is secret and the votes as counted cannot be attributed to an individual voter, Jason Ickes asserts that there is no way any voter could ever establish whether their individual vote was recorded as cast and therefore the voter must rely on the process to meet standards of security or be an open and transparent process that will not permit the alteration of a vote.

    d. Therefore, Jason Ickles asserts standing in that his vote was diluted and that there is substantial concern that the 2020 election did not determine the winner of the presidential election accurately.

2. Plaintiff Ken Beyer is a citizen of Michigan who voted in the 2020 presidential election and is domiciled in Allegan County, Michigan.

    a. Ken Beyer declares that he has suffered a particularized, individualized harm in that he through counsel has requested information by FOIA that has not been provided and has been reported as not being preserved.

    b. Further, that Ken Beyer has reviewed affidavits, summary reports and other evidence including evidence from expert witnesses that shows that some votes in the Presidential Election are not counted as cast, that votes reported by voters have been removed and that votes cast in person are reported as

cast by absentee with fictitious records demonstrating a ballot was mailed and returned.

c. As the ballot process in Michigan is secret and that the votes as counted cannot be attributed to an individual voter, Ken Beyer asserts that there is no way any voter could ever establish whether their individual vote was recorded as cast and therefore the voter must rely on the process to meet standards of security or be an open and transparent process that will not permit the alteration of a vote.

d. Therefore, Ken Beyer asserts standing in that his vote was diluted and that there is substantial concern that the 2020 election did not determine the winner of the presidential election accurately.

3. Plaintiff Macomb County Republican Party is a county political party that elected an executive committee for Macomb County as defined by MCL 168.599 which selected its chair Mark Forton and the officers of Macomb County who join this action in both their official capacity and as voters in the 2020 Presidential Election. They are residents of Macomb County, Michigan.

a. That as the leaders of a county executive committee, the MCRP officer have a particularized injury in that they and others from their county political party have provided substantial money, time, and effort to support a candidate for President that was determined to have lost the 2020 election.

b. That as the leaders of a county political party they have also reviewed the Edison election data results from the 2020 election that show significant problems in the precincts from Macomb County as they reported data in a cumulative process had the data show significant abnormalities. The

process is additive only but here were changes that showed both the total vote and the manner of voting being altered in increments as best displayed in the video located at https://rumble.com/v1cop5n-macomb-county-2020-election-in-ninety-seconds.html

c. That the Macomb County Republican Party indicates that the election results reporting shows manipulation of the voting in real-time at a speed that it must be generated by the Electronic Voting Systems and the Election Management Systems.

d. That the precincts as they report their tabulated totals should not have amendments that delete or remove the vote totals or the total by whether a vote was cast in person or absentee.

e. All officers also were voters in the 2020 elections and have concerns about the machine 'flipping' votes in Antrim County, affidavits from around the state that show that voters report no record of their vote, an improper record as absentee when voting in person or that persons voted from their property without being residence

4. Plaintiff Donna Brandenburg is a candidate for Michigan governor for the US Taxpayers party and on the ballot on November 8, 2022, and was a voter in the 2020 Election

a. Donna Brandenburg reasserts as a voter that she has reviewed the evidence that her vote was diluted, that she has no way with a secret ballot to determine if her vote was individually flipped, and that she is aware of the problems in Antrim.

b. Many media reports that this has been repeated and found with other hand recounts recently, including the report here from Dekalb County Georgia in the 2022 election. Again described as a glitch https://www.fox5atlanta.com/news/dekalb-county-certifies-primary-election-results-following-glitch. While this was in a Democratic primary it resulted in a candidate who finished third being declared the primary winner. This was after she discovered that the third-place finisher won the precinct reported her at zero votes despite knowing that she and her husband voted. This glitch again was only discovered by chance and confirmed that ballots flipped with a hand recount.

c. Media reports that a hand recount showed vote flipping on an abortion ballot proposal in which the results changed the outcome while only counting a partial amount and after spending more than $100,000 in Cherokee County, Kansas. https://www.pbs.org/newshour/politics/kansas-election-officials-confirm-recount-results-in-favor-of-abortion-rights.

d. Donna Brandenburg raises the issue of the accuracy of the tabulation process not only as a voter whose vote was diluted in 2020 but as a candidate in the next election as she is on the ballot for a third party, the US Tax Payers Party of Michigan.

e. It is critical to third-party candidates that every vote be counted accurately even when the votes do not determine the outcome as it relates to funding and ballot presence. In the 2022, Michigan Governor race, Candidate Brandenburg has a good-faith belief that she is able to win the race.

5.     Plaintiff Election Integrity Fund and Force (EIF) is a Michigan non-profit organization that is concerned as a non-partisan community activist organization dedicated to having accurate, honest elections in Michigan.

    a.  EIF has spent a significant amount of time and money to understand whether the 2020 Presidential Election Results accurately reported what occurred in the election.

    b.  The focus of EIF was not on the outcome but rather as a public interest entity with a mission to determine whether voter records were accurate. As such they have sent requests for information under Michigan's Freedom of Information Act (FOIA) to multiple townships, city and county clerks as well as the Michigan Secretary of State.

    c.  EIF has also had teams of volunteers canvass in many precincts throughout Michigan and has collated information, affidavits, and witness statements from many jurisdictions that reflect problems with the integrity of the election—again without regard to outcome.

        i.  There are 'phantom' voters which have a record of voting at an address where the address either does not have a residence or the residents say that the voter did not live there at the time of the election.

       ii.  There are voters which report having voted but the records of the Secretary of State do not show that a ballot was received and tabulated.

iii. There are voters who report voting in person but the records of the Secretary of State show that an absentee ballot was mailed and/or returned with the voter disputing that as untrue.

iv. The findings from extensive communication with voters from around Michigan are condensed into seven (7) reports found at https://electionintegrityforce.com/.

v. Report three (3) shows that the Secretary of State is continuing to alter voting history long after the seven days that clerks have by law to update their information and that there are irreconcilable differences.

https://cdn.shopify.com/s/files/1/0599/1212/6656/files/Report-3-Irreconciable-Differences.pdf?v=1651894022

vi. Report seven (7) shows a summary of canvass results where voters were canvassed on whether the machines had accurately recorded the voter activity.

https://cdn.shopify.com/s/files/1/0599/1212/6656/files/The_Final_EIF_Canvass_Results_Aug_2022.pdf?v=1660433527

vii. As a public interest group devoted to understanding and compiling information from a non-partisan perspective, EIF claims standing in that they have been uniquely effected in that they have had to divert enormous resources and energy to investigate fairly what occurred in the 2020 election

6. Plaintiff Sharon Olson is the duly elected Clerk for Irving Township, Barry County Michigan, and responsible by statute for conducting the 2020 and 2022 elections.

    a. Sharon Olson is a local election law clerk.

    b. Sharon Olson does not have a stake in the outcome of the 2020 or future elections but has a legal obligation to make sure that she conducts the best and fairest election possible under the law.

    c. As an election clerk she is required by the Michigan Secretary of State to use the Electronic Voting System, or she faces the threat of removal (probably unconstitutional threat) or being charged with a misdemeanor for failure to comply with an instruction.

    d. The use of an uncertified machine or a machine that is not properly certified by an accredited laboratory is repugnant to Sharon Olson.

    e. The machine is either qualified to run an election with the software and hardware meeting the current security guidelines or it is not.

    f. As an election clerk, Sharon Olson faces a unique harm in that she would like to conduct an honest, fair transparent election without exposing her constituents to a device that is uncertified for protection against cybersecurity breaches (foreign or domestic) and does not provide a transparent audit trail for her constituents to be able to be assured that the election results represent the votes as cast by voters eligible to vote in her township.

7. The Michigan Governor, the Secretary of State and the Board of State Canvassers are appropriate parties to the action as they played a part in the certification of the 2020 election result from Michigan.

> It is well-settled that a state official may properly be made a party to a suit seeking to enjoin the enforcement of an allegedly unconstitutional act if that official plays some role in the enforcement of the act. *McCrimmon v. Daley,* 418 F.2d 366, 368 (7th Cir. 1969); *Oliver v. Board of Education of City of New York,* 306 F. Supp. 1286, 1288 (S.D.N.Y.1969); *Coon v. Tingle,* 277 F. Supp. 304, 306 (N.D.Ga.1967); *Fitts v. McGhee,* 172 U.S. 516, 530, 19 S. Ct. 269, 274, 43 L. Ed. 535 (1899).

8. There are three parties responsible for certifying the 2020 Presidential Election pursuant to Michigan Law: The Governor, the Secretary of State and the Board of State Canvassers.

**168.46 Presidential electors; determination by board of state canvassers; certificate of election.**

Sec. 46.

   As soon as practicable after the state board of canvassers has, by the official canvass, ascertained the result of an election as to electors of president and vice-president of the United States, the governor shall certify, under the seal of the state, to the United States secretary of state, the names and addresses of the electors of this state chosen as electors of president and vice-president of the United States. The governor shall also transmit to each elector chosen as an elector for president and vice-president of the United States a certificate, in triplicate, under the seal of the state, of his or her election.

9. On November 23, 2020, Defendant Gretchen Whitmer was the Governor of the State of Michigan and she unlawfully certified Michigan's 2020 presidential election results. (Michigan's 2020 presidential election certification is attached hereto as Exhibit 1).

   a. As the Governor, Gretchen Whitmer is a proper defendant in that she certified the 2020 election and must decertify the presidential election in

10

order for a fair, honest election to be conducted in accordance with equal protection requirements.

10. On November 23, 2020, Defendant Jocelyn Benson was the Secretary of State of the State of Michigan and she unlawfully certified Michigan's 2020 presidential election results.

    a. As the Secretary of State, Joselyn Benson is the proper defendant as she (1) has 'supervisory control' over the elections, (2) is charged with ensuring compliance with HAVA; and (3) is responsible for authorizing the use of electronic voting systems in Michigan.

    b. Under the Michigan Election Law, 1954 PA 116, as amended, MCL 168.1 et seq., the Secretary of State is the Chief Election Officer of this State and "shall have supervisory control over local election officials in the performance of their duties under the provisions of this act." MCL 168.21.

11. County, City and Township Clerks are not proper defendants in the lawsuit because they lack authority over the use of the electronic voting systems as required by the Michigan Secretary of State.

12. County Boards of canvassers are improper defendants because the Secretary of State has the authority to certify any election that the County Board refuses to certify and has therefore the final say in certification. Further, County Boards of Canvassers lack the authority to determine what, if an,y equipment is to be used within the Election System

13. The Legislature has been solely entrusted with determining the assignment of Presidential electors and they chose that it would be done by popular vote in a lawfully conducted election. The legislature adopted as mandatory the HAVA

standards for electronic voting systems and has not authorized the use of uncertified

or machines that have not been certified by an unaccredited laboratory or that use

software that has not been vetted in determining the actual vote.

14. The Michigan Board of State Canvassers certified the 2020 Election Results from

each county despite the problems know including the issues from Wayne County

Michigan.

## II.  JURISDICTION AND VENUE

15.    This verified Complaint is filed pursuant to 28 U.S.C. § 1331 and seeks damages

pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's constitutional right to vote, as provided for

by the Fourteenth Amendment to the Constitution of the United States.

16.    This verified Complaint is also filed pursuant to 28 U.S.C. § 2201 *et seq.* to 2201

"declare the rights and other legal relations of any interested party seeking such declaration, whether

or not further relief is or could be sought." 28 U.S.C. § 2201.

17.    This verified Complaint is also filed pursuant to 52 U.S.C. § 20705 and

requests that this Honorable Court issue a temporary restraining order to stop the Defendants

from destroying critical evidence from Michigan's 2020 presidential election and from using

an electronic voting system that is not properly certified and provides an adequate audit trail

to the public.

## III.  FACTUAL ALLEGATIONS

18.    On November 3, 2020, Michigan attempted to conduct an election for

President of the United States of America.

19.    However, as presented *infra*, the Defendants, Gretchen Whitmer and Jocelyn

Benson, did not have the legal authority to certify Michigan's 2020 presidential election.

20.     Pursuant to the Constitution of the United States, "Each State shall appoint, **in such Manner as the Legislature thereof may direct, a Number of Electors**, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector." U.S. Const. art. II, § 1, cl. 2 (emphasis added).

**A. The Electronic Voting System used in 2020 including the Election Management Software and Hardware (including ALL three (3) types of tabulators and the high-speed scanners (Machines) that were used in the 2020 presidential election in Michigan were not certified or accredited in accordance with to MCL 168.795a**

21.     Pursuant to Michigan law, "an **electronic voting system SHALL NOT BE USED in an election"** unless it meets certain requirements.

**168.795a Electronic voting system; approval by board of state canvassers; conditions; approval of improvement or change; inapplicability of subsection (1); intent to purchase statement; instruction in operation and use; disapproval.**

(1) An electronic voting system **shall not be used** in an election unless it is approved by the board of state canvassers as meeting the requirements of sections 794 and 795 and instructions regarding recounts of ballots cast on that electronic voting system that have been issued by the secretary of state, unless section 797c has been complied with, and **unless it meets 1 of the following conditions**:
  (a) Is certified by an independent testing authority accredited by the national association of state election directors and by the board of state canvassers.
  (b) In the absence of an accredited independent testing authority, is certified by the manufacturer of the voting system as meeting or exceeding the performance and test standards referenced in subdivision (a) in a manner prescribed by the board of state canvassers.

22.     Michigan provided the following definition at MCLA 168.704(f)

(f) "Electronic voting system" means a system in which votes are recorded and counted by electronic tabulating equipment.

23.     Michigan provided the following definition at MCLA 168.704(e)

(e) "Electronic tabulating equipment" means an apparatus that electronically examines and counts votes recorded on ballots and tabulates the results.

24.     After the Electronic voting system is approved any changes to the system, especially the software, must also be approved pursuant to MCL 168.795a(6)

> (6) After an electronic voting system is approved, an improvement or change in the electronic voting system shall be submitted to the board of state canvassers for approval pursuant to this section. This subsection does not apply to the technical capability of a general purpose computer, reader, or printer to electronically record and count votes.

25.     On information and belief, the electronic voting system software that was used in the 2020 election was not certified either by an independent testing authority which was accredited by the national association of state electors AND the board of state canvassers

26.     On information and belief, the electronic voting system software that was used in the 2020 election was not certified by the manufacturer of the voting system as meeting or exceeding the performance and test standards of the board of state election directors in a manner prescribed by the board of state canvassers.

27.     Pursuant to MCL 168.795a, some additional pre-requisites for use in a Michigan election include mandatory compliance with:

> a.  MCL 168.794 http://legislature.mi.gov/doc.aspx?mcl-168-794
>
> b.  MCL 168.795 http://legislature.mi.gov/doc.aspx?mcl-168-795
>
> c.  MCL 168.797(c) http://legislature.mi.gov/doc.aspx?mcl-168-797c

**B.    The Laboratory used to certify the Electronic Voting Systems was not authorized to perform testing and certification by the Help America Vote Act of 2002 as required by Michigan law.**

28.     Pursuant to Michigan law, "the **Secretary of State is responsible for the coordination of the requirements imposed under** this chapter, the national voter

registration act of 1993, and **the Help America Vote Act of 2002**" M.C.L.A. § 168.509n (emphasis added).

29.     The requirement in Michigan Law, MCLA 168.509n,  that directs the Michigan Secretary of State to comply with the Help America Vote Act of 2002 was effective on October 29, 2002.

30.     The Help America Vote Act of 2002 created "the Election Assistance Commission" and the Election Assistance Commission (EAC) is referred to in the Act as the "Commission." 52 U.S.C. § 20921 (formerly cited as 42 U.S.C. § 15321.

31.     The Election Assistance Commission "shall serve as a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of Federal elections by -- … **(2)** carrying out the duties described in part B of this subchapter (relating to the testing, certification, decertification, and recertification of voting system hardware and software)…." 52 U.S.C. § 20922 (formerly cited as 42 U.S.C. § 15322).

32.     The Election Assistance Commission "shall provide for the testing, certification, decertification, and recertification of voting system hardware and software **by accredited laboratories.**" 52 U.S.C. § 20971(a)(1) (formerly cited as 42 U.S.C. § 15371) (emphasis added).

33.     Additionally, at "the option of a State, the State may provide for the testing, certification, decertification, or recertification of its voting system hardware and software **by the laboratories accredited by the Commission** under this section." 52 U.S.C. § 20971(a)(2) (for Pursuant to the U.S. Election Assistance Commission, there are **only two Voting System Test Laboratories (VSTL) that are accredited** by the Election Assistance Commission: (1)

**Pro V&V**; and (2) SLI Compliance. U.S. Election Assistance Commission, VOTING SYSTEM TEST LABORATORIES (VSTL), https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl (last visited June 21, 2022) (emphasis added) merely cited as 42 U.S.C. § 15371) (emphasis added).

34.     Michigan has expressly opted into compliance with 52 USC 2097 with MCL 168.509a.

### MICHIGAN HAS ELECTRONIC VOTING SYSTEMS IN USE BY COUNTIES THAT ARE NOT CERTIFIED AND SOME OF THESE WERE CERTIFIED BY AN UNACCREDITED LABORATORY.

35.     Michigan has 83 counties that all had the option to select the electronic voting system from the three choices provided by the Michigan Secretary of State.

36.     A startling twenty-four (24)  counties do not have a certified system pursuant to the information presented at https://www.eac.gov/voting-equipment/system-certification-process (last visited August 31, 2022).

37.     Almost 29% of the counties do not use a certified system.

38.     Pursuant to the EAC website, eleven (11) Counties used Hart Verity 2.2.2. which was certified. https://www.eac.gov/voting-equipment/system-certification-process (last visited August 31, 2022).

39.     Pursuant to the EAC website, forty-eight (48) counties use Dominion's D-Suite 5.5. https://www.eac.gov/voting-equipment/system-certification-process (last visited August 31, 2022).

40.     The Dominion Election Management system was used in more than 57% of the Michigan counties

41.     Pursuant to the Michigan Secretary of State, the Dominion election voting systems used in the November 3, 2020 presidential election were "certified" on November 15, 2019, with an EAC System ID # as follows: DVS-DemSuite5.5-B. Michigan Secretary of State, Certified Vote Tabulating Equipment as of July 22, 2020.

42.     The software version that was certified reports as version 5.5-B while the website indicates that the counties were certified for use in version 5.5.

43.     Regardless, these forty-eight (48) counties appear to have relied upon the validity of the November 15, 2019 certification and the laboratory that performed the testing.

## ACCREDITATION ISSUE

44.     Pursuant to the Michigan Secretary of State's website and hyperlink in the above PDF, DVS-DemSuite5.5 is manufactured by Dominion Voting Systems Corp and the Testing Laboratory was Pro V&V. U.S. Election Assistance Commission, https://www.eac.gov/voting-equipment/democracy-suite-55 (last visited August 29, 2022).

45.     Pursuant to the U.S. Election Assistance Commission's website, Pro V&V received a Certificate of Accreditation on February 24, 2015.



46.     There is no evidence of that PRO V and V was recertified.

47.     Pursuant to Version 2.0 of the Voting System Test Laboratory Program Manual, which was effective May 31, 2015, "A grant of accreditation is valid for a period **not to exceed two years**." Voting System Test Laboratory Program Manual, p. 39, § 3.8.

48.     On November 15, 2019, the Pro V & V Accreditation was lapsed by more than two years.

49.     On November 15, 2019, Pro V&V was not accredited by the U.S. Election Assistance Commission. U.S. Election Assistance Commission, https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl/pro-vv (last visited August 29, 2022).

50.     Pro V&V did not receive another Certificate of Accreditation until **January 27, 2021**, which was after the 2020 presidential election.

51.     Since Michigan law expressly requires that the "requirements imposed under… the Help America Vote Act of 2002," the Michigan voting machines or devices must have been tested and approved by a laboratory that was accredited pursuant to the Help America Vote Act of 2002

52.     However, Pro V&V was not even accredited on November 3, 2020, as a laboratory in addition to having expired accreditation on the day of November 15, 2019, when they claimed to certify the Dominion system.

53.     Valid accreditation is governed by Rule 3.8 of the Voting System Test Laboratory Manual Version 2.0 which was expired as 2/24/2017 for Pro V & V.

54.     Under Rule 3.6.2 the EAC would be required to publish an application for a Certificate of Accreditation, so no application was pending.

55.     The only two enumerated exceptions to grant an extension or toll the time frame of an accreditation are inapplicable as BOTH exceptions require a pending application that was filed before the lapse of the previous certificate of accreditation.

1. **THE PROBLEM WITH THE ELECTRONIC VOTING SYSTEMS CERTIFICATION**

56.     The US Election Assistance Commission certifies electronic voting systems to the federal standards and has issued three versions of the standards for electronic voting

systems which are version 1.0; 1.1 and 2.0. [Certified Voting Systems | U.S. Election Assistance Commission (eac.gov)](Certified Voting Systems | U.S. Election Assistance Commission (eac.gov))

57.     The electronic voting systems include the hardware and software that is used as described in the Michigan Election code which includes the three vendors each offering different types of tabulators and the election management system software.

58.     The requirement to also comply with the additional requirements of the Help America Vote Act of 2002 was passed into Michigan law on October 29, 2002.

59.     The essential components of the electronic voting systems include the election management software that accumulates the precinct votes at the county level and the tabulators that read the ballots and count the votes at a precinct level.

### a. TABULATORS

60.     On information and belief, none of the counties in Michigan used an electronic voting system that was properly certified by the US Election Assistance Commission.

61.     On information and belief, SOME of the counties in Michigan used an electronic voting system that was not properly certified by the US Election Assistance Commission.

62.     On information and belief, all of the counties in Michigan intend to use an electronic voting system that does not meet or exceed the current standards of the US EAC which is VVSG 2.0 from 2021 in the November 2022 General Election.

63.     On information and belief, many, if not all, of the counties in Michigan electronic voting systems used in the 2020 Michigan Presidential election were not certified to the standards of the US EAC VVSG 1.1 from 2009.

64.     On information and belief, the electronic voting systems used in the 2020 Michigan Presidential election were not certified to the standards of the US EAC VVSG 1.0 from 2005 in many, if not all, of the counties in Michigan.

## b. ELECTION MANAGEMENT SOFTWARE VVSG 2.0

65.     The November 15, 2019 "certification" that was presented above for fifty-nine (59) of the eighty-three (83) counties in Michigan was to the VVSG 1.1 standard from 2009.

66.     On information and belief, the current election management software used does not meet the current standards of the US EAC which is VVSG 2.0 from 2021.

67.     The scheduled 2022 General Election will therefore use machines that are not certified to the current standards unless this court enforces the law that requires the machines comply.

## 2.  SECURITY PROTECTIONS REQUIRED

68.     VVSG 2.0 was "designed to meet the challenges ahead, to replace decade's old voting system standards, to improve the voter experience, and provide necessary safeguards to protect the integrity of the voting process." EAC Testing and Certification Program.

69.     The new upgraded requirements in VVSG 2.0 included security features:

      a.  Software independence is a requirement. A software independent voting system does not rely solely on software and an undetected change or error in its software cannot cause an undetectable change or error in an election outcome. This includes the use of paper ballots, cryptographically verifiable (E2E) ballots, access controls, encryption, physical security, logging, and auditing.

b. Wireless systems are disallowed. Voting systems are not allowed to connect wirelessly to external networks. Unused ports and processes must be removed or disabled. Accessibility is provided for by allowing the use of Bluetooth adapters connected to the voting device's headphone jack as this does not increase the attack surface of the system. The use of firewalls, intrusion prevention, and other means is recommended in the requirements.

c. Physical security includes logically disabling physical ports that are not essential to voting operations. All new connections and disconnections must be logged.

d. Multi-factor authentication is required for all critical operations such as software updates, aggregating and tabulating votes, enabling network functions, changing device states (opening/closing polls), or modifying authentication mechanisms.

e. System integrity requires risk assessment and supply chain risk management strategy, removes non-essential services, requires exploit mitigation (e.g., address space layout randomization (ASLR), data execution prevention) and the system to be free of known vulnerabilities, cryptographic boot validation, and authenticated updates.

f. Data protection requires FIPS 140-2 validated cryptographic modules (except E2E), cryptographic protection of various election artifacts and digitally signed cast vote records and ballot images

70.     Compliance with an outdated standard does not provide for a secure safe election.

### CONSEQUENCE OF NON-COMPLAINCE

71.     Since the electronic voting systems were used in violation of Michigan law, then said election is void *ab initio,* and said 2020 election cannot be certified by any of the Defendants.

72.     Since the Dominion Democracy Suite 5.5 has been not tested and approved by a laboratory that is "accredited" pursuant to the Help America Vote act of 2002 to the standards of the VVSG 1.0 or 1.1, the use said voting machine in the 2020 election was illegal. These forty-eight counties cannot use their electronic tabulators or election management software in the November 8, 2022 election or any further election until they comply with the law

73.     The E S voting systems being used in the twenty-four (24) other ES&S systems has been not tested and approved by a laboratory that is "accredited" pursuant to the Help America Vote act of 2002 to the standards of the VVSG 1.0 or 1.1, the use said voting machine in the 2020 election was illegal.

74.     Since NONE of the electronic voting systems used by the counties in Michigan in 2022 are not compliant with the new VVSG 2.0 and tested and approved by a laboratory for use in the 2022 Michigan General Election on November 8, 2022, then the systems MUST not be used UNTIL they are compliant.

### The 2020 Election cannot be certified.

75.     Void *ab initio* is defined as "Having no legal effect from inception." Thompson Reuters Practical Law, definition of "*Void ab initio*" last visited June 21, 2022

(https://1.next.westlaw.com/Glossary/PracticalLaw/I41334c8d07ef11ebbea4f0dc9fb69570?contextData=(sc.Default)&firstPage=true&transitionType=Default)

76.     Void *ab initio* means that the action taken is **void**; it is **not voidable**. *See id*.

77.     Void *ab initio* means that the action taken "has no legal effect." *Id*.

78.     "A void action cannot be ratified or validated [or certified]." *Id*.

79.     "An action that is void *ab initio* **never had any legal effect**." *Id* (emphasis added).

80.     In order for Michigan to conduct a valid election, the Michigan Secretary of State must comply with the requirements contained in M.C.L. § 168.795 and M.C.L. § 168509n *et seq*. as well as the requirements contained within the Help America Vote act of 2002 which is 52 U.S.C. § 20921.

81.     Since the legal requirements contained in M.C.L. § 168.795; M.C.L. § 168509n *et seq*. and the Help America Vote Act of 2002 were not met, then the Michigan Secretary of State and Governor had no authority to use any voting machine or device in violation of said statutes.

82.     Since the legal requirements contained in M.C.L. § 168.795; M.C.L. § 168509n *et seq*. and the Help America Vote Act of 2002, then the Michigan Secretary of State and Governor had no authority to certify the results of Michigan's 2020 presidential election and their certification signatures are void *ab initio*.

83.     As such, Michigan conducted an **unlawful and illegal** presidential election, which the Michigan Secretary of State and Governor could not lawfully certify.

84.     As such, Defendant Gretchen Whitmer's certification of Michigan's 2020 presidential election was/is **void _ab initio_** as she did not have the requisite authority under Michigan law to certify said election.

85.     Defendant Jocelyn Benson's certification of Michigan's 2020 presidential election was/is **void _ab initio_** as she did not have the requisite authority under Michigan law to certify said election.

86.     As such, it is incumbent upon this Court to issue a writ mandamus ordering Defendant Jocelyn Benson, in her official capacity as the Michigan Secretary of State, and Defendant Gretchen Whitmer, in her official capacity as the Michigan Governor to decertify Michigan's 2020 presidential election results.

87.     It is further incumbent upon this Court to issue a writ of mandamus ordering the Defendants to re-run the 2020 presidential elections _instanter_ as the purported election conducted on November 3, 2020, was/is **void _ab initio_** and said election is uncertifiable.

88.     Plaintiffs all assert a constitutional right to participate in Michigan's 2020 presidential election. _See_ U.S. Const., Amend. 14.

89.     Michigan's failure/refusal to comply with M.C.L.A. § 168.795a and 52 U.S.C. § 20901 _et seq_. violates Plaintiff's constitutional right to vote and said actions are actionable pursuant to 42 U.S.C. § 1983.

90.     Pursuant to Bush v Gore, 531 US 98 (2000), a voter has an equal protection right to 1) access to the polls 2) to have the vote counted as cast (not altered) and 3) to not be diluted.

**ELECTION RECORDS**

91.     Pursuant to 52 U.S.C. § 20701, the Defendants are required to retain and preserve all records and papers relating to Michigan's 2020 presidential election.

92.     Pursuant to MCL 168.811 certain records are required to be retained for two years or six years.

> **MCL 168.811 Election returns, records, and applications; preservation; destruction; time.**
>
> Sec. 811.
>
> All election returns, _including poll lists_, statements, _tally sheets_, absent voters' return envelopes bearing the statement required by section 761, absent voters' records required by section 760, and other returns made by the inspectors of election of the several precincts _must be carefully preserved and may be destroyed after the expiration of 2 years following the primary or election at which the same were used._
>
> All applications executed under section 523, all voter registration applications executed by applicants under section 497(3) and (4), and _all absent voters' applications must be carefully preserved and may be destroyed after the expiration of 6 years following the primary or election at which those applications were executed_.

93.     Pursuant to the  Federal Prosecution of Election Offenses Seventh Edition May 2007 (Revised August 2007) (justice.gov)The manual called the Federal Prosecution of Election Offenses (8th Edition) the most current edition is found at the link is mislabeled seventh edition above. The manual is from December of 2017:

> The retention requirements of Section 20701 are aimed **specifically at election administrators**. In a parochial sense, these laws place criminally sanctionable duties on election officials. However, in a broader sense, this federal retention law assists election administrators in performing the tasks of managing elections and determining winners of elective contests. It does this by requiring election managers to focus appropriate attention on the types of election records under their supervision and control that may be needed to resolve challenges to the election process, and by requiring that they take appropriate steps to ensure that those records will be preserved intact until such time as they may become needed to resolve legitimate questions that frequently arise involving the election process. [_Fed Prosecution of Election Offenses_ at page 89]

Section 20701 does apply to all records generated in connection with the process of registering voters and maintaining current electoral rolls [at page 89]

This statute must be interpreted in keeping with its congressional objective: under Section 20701, *all documents and records that may be relevant to the detection or prosecution of federal civil rights or election crimes must be maintained* if the documents or records were **generated** in connection with an election that included one or more federal candidates. [at page 90]

94.     Electronic records from the election that were generated include but are not limited to audit logs and security logs as well as electronic files of the cast vote records and ballot images.

95.     VVSG 2.0 requires the logging of the "audit trail" and the audit trail is required by MCL 168.794.

96.     Attached are some of the requirements from the VVSG 2.0 which was adopted by the Michigan Legislature in MCL 169.609n when it adopted the Help America Vote Act of 2002 and mandate its voluntary standards into the use of electronic voting machine requirements. See Appendix A

97.     Pursuant to 52 U.S.C. § 20701, Defendants are only required to preserve the evidence for twenty-two (22) months.

98.     11/03/20 + 22 months = 09/03/22

99.     Many records of the 2020 election have yet to be produced despite requests from FOIA, or have been reported lost.

100.    There is no requirement in law ever to destroy or delete these records.

101.    The Court must enter a preservation order for these records until this case is concluded or further order of the court.

102. Pursuant to 52 U.S.C. § 20705, the United States District Court for the district in which a demand is made pursuant to 52 U.S.C. § 20703 shall have jurisdiction.

103. The rights under 52 USC 20701 may not be enforceable by a private citizen in a separate action and the request for preservation is not made on the basis of the cause of action-rather the records are asked to be preserved to allow discovery into the underlying claim which is that there has been a denial of equal protection to the voters of Michigan when the machines that determine election outcomes do not meet a legislatively mandated standard of compliance which is designed to ensure the security of elections. This preservation order is needed because of the pending expiration of federal and state records retention minimums but the preservation order is NOT requested based on the statutes rather it is based on preservation of discovery needed to prosecute this lawsuit.

104. The security of elections standards are important because it is likely that vote flipping will go largely undetected because of ballot secrecy when the ballots are commingled—especially when there is not a transparent audit trail.

105. The best protection of Equal Protection is to comply with current standards that have been set forth by the US Election Assistance Commission in the most current VVSG.

## DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201

106. Plaintiffs incorporate by reference all paragraphs above as if fully stated herein.

107. Plaintiffs request a declaratory judgment that the Help America Vote Act of 2002 is constitutional.

108. Plaintiffs request declaratory relief that the Help America Vote Act established the US Election Assistance Commission

109.    Plaintiffs request declaratory relief that the US Election System has adopted the Voluntary Voting System Guidelines.

110.    Plaintiffs request declaratory relief that Michigan has adopted the Help America Vote Act and the voluntary guidelines as mandatory requirements.

111.    Plaintiff requests declaratory relief that the Secretary of State is responsible for coordination of the requirements of the Help America Vote Act pursuant to MCL 168.509n.

112.    Plaintiffs request declaratory relief that the VVSG has issued three versions of the guidelines:

2005 VVSG 1.0

2009 VVSG 1.1

2021 VVSG 2.0

113.    Plaintiff requests declaratory relief that Electronic Voting Systems must meet certain standards to have certification.

114.    Plaintiffs request declaratory relief that the Election Assistance Commission has the authority to accredit laboratories for testing of the Electronic Voting Systems and that such an accreditation is required for certification.

115.    Plaintiffs request declaratory relief that the mandatory standards in effect at the time of the 2020 election was VVSG 1.1.

116.    Plaintiffs request declaratory relief that the electronic voting systems used by 24 Michigan counties provided by manufacturer ES&S were not certified as meeting the VVSG 1.1 for the 2020 election.

117. Plaintiffs request declaratory relief that the electronic voting systems used by 48 Michigan counties provided by manufacturer Dominion were not certified as meeting the VVSG 1.1 for the 2020 election; to wit: the software used was not the software tested or in the alternative, the laboratory was not accredited rendering the certification an opinion.

118. Plaintiffs request this Honorable court enter declaratory relief as to whether the electronic voting system in Michigan was therefore improperly used in the Michigan 2020 election.

119. Plaintiffs further requests declaratory relief that the electronic voting systems be required to meet the VVSG 2.0 in any future Michigan elections.

## VIOLATION OF CONSTITUTIONAL RIGHTS UNDER 42 USC § 1983

120. Plaintiff incorporates all prior allegations…

121. Under 42 USC § 1983 an individual may bring an action against state actors under 42 USC § 1983 for a deprivation of his or her constitutional rights.

122. A cause of action under 42 USC § 1983 must allege deprivation by a governmental entity, governmental official, or a state actor acting as a governmental entity or official, of rights secured by the United States Constitution.

123. The right to vote is the fundamental constitutional right held by each individual citizen of the United States and is preservative of all other rights.

124. Under the First, Ninth, and Fourteenth Amendments, *inter alia*, Plaintiff has a constitutional right to vote for the candidate of his choice, but also the constitutional right not to have his vote diluted, canceled out, and/or nullified by the counting of illegal or false or fraudulent votes and/or by the failure to count legal votes, and or by the certification of fraudulent and/or unverifiable votes. *Reynolds v Sims*, 377 U.S. 533, 555 (1964).

125.     Under the Equal Protection Clause, Plaintiff has a constitutional right to enjoy equal protection of the law and equal treatment in exercising his right to vote; and the constitutional right not to have his vote diluted, canceled out, and/or nullified by the counting of illegal or false or fraudulent votes and/or by the failure to count legal votes, and or by the certification of fraudulent or unverifiable votes.  Cite equal protection clause; Reynolds, supra.

126.     Due to the failure on the part of Defendants to have ensured certification or otherwise caused to be certified voting machines used in the state of Michigan in the November 2020 election, individual ballots cast by Plaintiffs were diluted, canceled out, and/or nullified.

127.     This dilution is demonstrated in that unauthorized ballots were cast in the 2020 election.

128.     Further that while Antrim was corrected by hand count that ballot flipping is hard to detect without the public having access to the audit trail or having a hand count—Antrim is not an isolated clerk issue.

129.     If the Defendants named herein cause, direct, or otherwise allow the information and data required to be preserved for 22 months under Michigan Law destruction of such will make it impossible to demonstrate that the failure of certification of voting machines, as well as other fraudulent, intentional, grossly negligent, and negligent acts on the part of the Defendants, caused Plaintiff's constitutional rights to be violated as described herein under the stated causes of action available under 42 USC § 1983.

130.     The preservation request but any 42 USC § 1983 action and the that defendants' fraudulent, intentional, reckless, grossly negligent, and negligent acts were the proximate cause of deprivation of Plaintiff's constitutional rights as stated herein in the fact

that Michigan provides for an audit trail in MCL 168.795k which is a part of the voting franchise and was incorporated into the Michigan Constitution which guaranteed the right of every citizen to request an audit in Article 4 Section H which provides for the "right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections. This bears directly on the Equal Protection clause which protects against the altering or dilution of votes

131.   The Plaintiffs declare that there is substantial evidence that the equal protection right has been violated, including but not limited to:

> a. There are many voters who reported by affidavit to Election Integrity Fund and Force that they cast a ballot in the 2020 election but the Secretary of State QVF history does not record their vote as being cast and are not otherwise accurate. This is evidence of not having had votes recorded as cast.
>
> b. Accurately also means that QVF histories provided by the Michigan Secretary of State on December 1, 2020; December 31, 2020, and April 1, 2021, show that there is alteration of the records from report to report.
>
> c. There are many residences in Michigan that have voters who have attested in affidavit that persons who have recorded a voted in the QVF as not being a resident of the home. This is evidence of votes being recorded to persons who do not have the legal authority to vote in that jurisdiction.

d. There are many voters who have provided an affidavit that they voted in person and never received or returned a mail-in-ballot but the QVF shows that the voter voted absentee and falsely records the return of a ballot by mail.

e. That these problems are not limited to any single jurisdiction and can not be the result of clerical error.

f. That Antrim County which used a Dominion Electronic Voting System had results in which the machine 'flipped' votes from one candidate to another.

g. That on information and belief that this has occurred in other counties in Michigan

h. That evidence has come out demonstrating this vote "flipping" problem has occurred in other US jurisdictions most recently in Cherokee County Kansas and DeKalb County Georgia.

i. That without preservation and access to all of the 2020 election records including ballots, ballot images, audit logs, the electronic Cast Vote Records, the tabulator reports, the tabulator configuration and security logs, and the electronic poll book and its configuration, audit and security logs then there will be no way through discovery to determine the extent of the problem

132. A lack of valid certification which sets forth a minimum security and cyber security standard before use of the machine should not require a showing that the machine was unsecure or that votes were altered, improperly

counted or otherwise improperly recorded—instead the failure of certification to the minimum standard is itself a violation of Equal Protection.

133.    Equal protection as explained in <u>Bush v Gore, 531 US 98 (2000)</u> required that the legislature adopt an objective standard for the counting of the votes. This ultimately resulted in HAVA which set forth—the standard (VVSG) when adopted by the Michigan Legislature is what prevents the use of voting system that arbitrarily and capriciously determines the outcome of an election.

134.    Equal Protection Rights were therefore violated in the November 3, 2020, Presidential Election in fundamental ways:

   a. First, the votes of the Plaintiffs and others were diluted by ballots that were not authorized to cast a ballot in the election;

   b. Second, the failure to provide a public audit trail to ensure the rights were protected even when guaranteed in the Michigan Constitution to safeguard the right

   c. Third, failure to adhere to a legislative standard that is free from arbitrary and capricious state action requires every electronic voting system used in Michigan county to count votes and report election outcomes be actually certified to the objective current standard of VVSG as outlined in HAVA by a VSTL that is accredited by the US Election Assistance Commission.

   d. The failure to require all Voting System Test Laboratories (VSTL) to have a valid accreditation before issuing a certification (opinion) on

compliance of an electronic voting system used in the 2020 election to count votes and report election outcomes. The VSTL is another standard that prevents arbitrary and capricious state action.

  e. The use of some counties which adhered to an objective standard (11) while the remaining counties failed to comply is treating the approval of electronic voting systems differently and therefore treating the election differently to each voter in how the vote is protected and the audit trail is preserved.

135. The violation of equal protection was willful and intentional in that the Michigan Secretary of State knew that the electronic voting systems were not properly certified to VVSG 1.1 standards as configured and/or the the certification was by a laboratory that did not meet the VTSL version 2.0 standards as required by Michigan Law and HAVA.

136. The lawsuit has advanced two legal causes of action 1) for declaratory relief and 2) damages for violation of equal protection rights.

137. The lawsuit seeks additional equitable remedies 1) mandamus asking for the redo of the presidential election, 2) injunctive relief for the preservation of election generated data from 2020; and 3) injunctive relief for non-compliance with HAVA as required by Michigan Law.

138. There is no legally binding precedent on whether the 2020 Presidential Election can be re-run when there are significant issues with the election records and electronic voting systems were not 'qualified' to conduct the election.

139.    Ordering an election to be re-run is a traditional remedy when there are irregularities and fraud. Recently the media reported that in 2020 a New Jersey Judge ordered an election to be re-run. [Judge Orders New Election Must Be Held In New Jersey After Mail-In Voter Fraud Charges | The Daily Wire](#)

140.    Attached is the verification by Jason Ickes.

**WHEREFORE,** premises considered, the Plaintiffs pray as follows:

1.    That good and adequate service be had on all Defendants;

2.    That this Court issue a preliminary injunction ordering

   a.  the Defendants to remove any/all election equipment for the 2022 elections that is not certified by an accredited voting system test laboratory: and

   b.  the Defendants to preserve all 2020 presidential election records (electronic or otherwise) indefinitely as the 2020 presidential election is still being investigated.

3.    That this Court issue a permanent injunction against the future use of electronic voting systems in Michigan that are not certified by an accredited laboratory (VSTL compliant ) as complying with the current standards of the (VVSG compliant) especially as it relates to the security and integrity of the elections overseen by the Michigan Secretary of State

4.    That this Court issue a *writ of mandamus* compelling the Michigan Secretary of State and Governor to

a. decertify the Michigan's 2020 presidential election and to recall Michigan's Joseph R. Biden presidential electors;

b. order the Defendants to work together to rerun the Michigan 2020 presidential election as soon as possible, by way of a special election, with paper ballots only, on a single election **day**, with the votes being counted by hand, with members of all political parties present to observe, with a public livestream of all vote counting;

5.   In addition, the Plaintiffs request

a. An award of damages to be determined by a jury of twelve (12);

b. An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

c. Such other relief to which the Plaintiffs may show themselves to be entitled.

Respectfully submitted this 9th day of September 2022.


/s/Daniel J. Hartman                                   /s//RUSSELL NEWMAN

Daniel J. Hartman (P52632)                    Russell Newman A. Newman*
Law Office of Daniel J. Hartman             TN BRP#033462
Attorney for Plaintiffs                               Attorney for Plaintiff Jason Ickes
PO BOX 307                                               253 S. Tamiami Suite 120
Petoskey, MI 49770                                  Nokomis, FL 34275
(231) 348-5100                                         (615) 544-1510
Danjh1234@yahoo.com                           russell@thenewmanlawfirm.com
                                                                  *Application to Western District
                                                                  Forthcoming

**APPENDIX A: VVSG Standards for Preserving Generated Electronic Records**

10.2.4. B The voting system needs to be constructed so that the security of the system does not rely upon the secrecy of the event logs. It will be considered routine for event logs to be made available to election officials, and possibly even to the public, if election officials so desire. The system will be designed to permit the election officials to access event logs without fear of negative consequences to the security and integrity of the election. For example, cryptographic secret keys or passwords will not be logged in event log records.

11.1 – Access privileges, accounts, activities and authorizations are logged, monitored, and reviewed and modified as needed ensures there are records in case there are errors or incidents that need to be accounted for. The system also prevents logging any voter ID information and prevents the logging capability from becoming disabled or the log entries from being modified. The system provides administrators access to logs, allowing for continuous monitoring and periodic review.

11.1-A – Logging activities and resource access
The voting system must log any access to, and activities performed on, the voting system, including:
1. timestamps for all log entries;
2. all failed and successful attempts to access the voting system; and
3. all events which change the access control system including policies, privileges, accounts, users, groups or roles, and authentication methods.
Discussion
In the event of an error or incident, the user access log can assist in narrowing down the reason for the incident or error.
 • Timestamped log entries will allow for easy auditing and review of access to the voting system.
• Access control logging supports accountability of actions by identifying and authenticating users.
• Groups are a collection of users that are assigned a specific set of permissions. Roles are an identity that is given specific permissions and can be assigned to a user. Any changes to the permissions assigned to groups and roles should be logged to identify updates to a user's privileges.

11.1-C – Preserving log integrity
The voting system must prevent:
1. the logging capability from being disabled;
2. the log entries from being modified in an undetectable manner; and
3. The deletion of logs; with the exception of log rotation.

Discussion

This requirement promotes the integrity of the information logged by ensuring all activities are logged. Additionally, it prevents these abilities from being an option within the user interface.
This requirement promotes the integrity of the information logged by ensuring all activities are not modifiable.
The removal of logs is only appropriate for log rotation, which is when the stored logs are rotated out to create more space for continuous logging. The voting system should be capable of rotating the event log data to manage log file growth. Log file rotation may involve regular (e.g., hourly, nightly, or weekly) moving of an existing log file to some other file name and/or location and starting fresh with an empty log file. Preserved log files may be compressed to save storage space.

12.2-E – Logging enabled and disabled ports
An event log entry that identifies the name of the affected device must be generated when physical ports are enabled or disabled.

Discussion

Logically disabling ports prevents unused ports from being used as a staging point for an attack on the voting system.

Discussion

Whether a port is disabled or not is security relevant, especially once a security incident has occurred, and this information would be useful when determining cause. 12.2-C – Physical port restriction applies to physical restrictions, whereas 12.2-D – Disabling ports discusses logical disabling of ports.