## IN THE UNITED STATES DISTRICT COURT FOR THE
### WESTERN DISTRICT OF MICHIGAN
### GRAND RAPIDS DIVISION

|  |  |
|---|---|
| **JASON ICKES, voter** | |
| **KEN BEYER, voter** | |
| **MACOMB COUNTY REPUBLICAN PARTY by its officers of the Executive Committee,** | **Civil Action No. :  22-cv-00817** |
| **DONNA BRANDENBURG, US Tax Payers Candidate for the 2022 Governor of Michigan,** | **HON. PAUL L. MALONY** **MAG. PHILLIP J. GREEN** |
| **ELECTION INTEGRITY FUND AND FORCE, a Michigan non-profit corporation, AND** | **PLAINTIFFS' REPLY BRIEF IN SUPPORT Of THE PRELIMINARY INJUNCTION** |
| **SHARON OLSON, in her official capacity as the Clerk of Irving Township Barry County**          **Plaintiffs,** | |
| **v.** | |
| **GRETCHEN WHITMER, in her official capacity as the Governor of Michigan, and** | |
| **JOCELYN BENSON, in her official capacity as Michigan Secretary of State** | |
| **MICHIGAN BOARD OF STATE CANVASSERS,**          **Defendants.** | |

# TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED.................................................................................. 3

INTRODUCTION .............................................................................................................. 4

HAVA: The Federal Standards .............................................................................................. 6

    THE EAC: What is their Role?........................................................................................... 7

    The State Plan ................................................................................................................ 8

    EAC: VSTL STANDARDS .............................................................................................. 12

    The Accreditation Program Manual (APM) Version 2.0............................................................ 13

    The Testing and Certification Manual (CPM) version 2.0 (2015)........................................... 19

    VVSG The Federal Guidelines for Certification ................................................................. 22

Direct Reply to issues raised in the Defendant's brief.................................................................. 23

ARGUMENT .................................................................................................................. 26

LIKELIHOOD OF SUCCESS ON MERITS .......................................................................... 26

    STANDING ................................................................................................................ 27

    LATCHES.................................................................................................................. 33

    EQUAL PROTECTION CLAIM REPLY ............................................................................ 36

    11th Amendment ........................................................................................................... 38

Irreparable Harm .............................................................................................................. 38

CONCLUSION ................................................................................................................ 40

STATEMENT OF ISSUES PRESENTED

1.  WHETHER THE PLAINTIFFS HAVE DEMONSTRATED A LIKILIHOOD OF
    SUCCESS OF THE MERITS?   Plaintiff Answers YES

2.  WHETHER THE PLAINTIFFS HAVE DEMONSTRATED IMMINENT
    IRREPARABLE HARM?  Plaintiff Answers YES

INTRODUCTION

This case is not about the 2020 election. The case is simply whether the electronic voting systems in Michigan are 'qualified" under Michigan law to run an election. The qualifications in the law are set by Michigan statute which adopted the federal standards of the US Election Assistance Commission.  The Secretary of State has failed to ensure that the machines were and are qualified to run the elections. The laws are designed to protect the purity of Michigan elections by meeting certain security and transparency standards. While the defendants argue this case is about an attack on the legitimacy of the 2020 election it is a basic question seeking declaratory relief on the issue of what is required by federal standards and Michigan law for an electronic voting system to be used to conduct a Michigan election.

After the declaratory relief which should be granted and there is a high likelihood of success as to the determination that the electronic voting systems in Michigan FAIL to meet the qualification of federal standards and Michigan law then there is a question of remedies…

What should be done about the 2020 election which was conducted with equipment that failed as a matter of law? What should happen in the 2022 mid-terms when it is shown the electronic voting system fails to qualify to conduct an election under federal standards and Michigan Law? The case is first and foremost a request for declaratory relief and secondarily a remedy.

The present issue before the court is the need to preserve the election data from the 2020 election. Why is this necessary? First, Michigan Law clearly requires an 'audit trail' in MCL 168.795(k) and while there is a definition in MCL 168.794a that speaks to what Michigan defines as an 'audit trail' there is the conflict when Michigan also adopted the federal standards of HAVA which has an expanded definition of an 'audit trail'. The audit trail definition has

evolved as the complexity of the electronic voting systems and the better definition is within the federal standards which have been adopted by Michigan law.

What is an audit trail? Practically speaking it is (1) the paper ballot (2) the optical scanned image that is generated by the tabulator (3) the Cast Vote Record (CVR) which is the translation of the optically scanned image into a table of results (4) the tabulator tapes which show the accumulation of votes by contest  (5) the audit and security logs showing the tabulator configuration and connectivity (6) the final statement of votes cast from the precinct (7) the link back to both the precinct electronic poll book to reconcile which voters cast ballots; and (8) the voter history which is required by Michigan law to be updated and maintained for a number of years.

Again, why is the preliminary injunction necessary? This is because many local election clerks in the precincts under the supervision of the Michigan Secretary of State (MCL 168.31) have failed to preserve OR produce the election data to the citizens of Michigan. In fact, the Michigan Secretary of State has ordered destruction of election material from the most recent Michigan Primary Election held on August 2, 2022, in violation of federal and state retention requirements.

Again, why is the preliminary injunction necessary? Because the failure to produce the records prevents the citizens of Michigan from reviewing the transparent election material and from having anything to support the claims that this was the 'safest and most secure' election in US history.

Again, why is the preliminary injunction necessary? The questions about the certification will invariably lead to the Secretary of State ATTEMPTING to move the question presented from the basic issue were the electronic voting systems qualified by law to conduct the Michigan

election TO a requirement that the lack of qualifications affected the outcome in 2020 or present a risk of affecting the 2022+ outcome…

HAVA: The Federal Standards

The Help America Vote Act of 2002 established the US Election Assistance Commission (EAC) . The Michigan Secretary of State website Help America Vote Act (HAVA) (michigan.gov) states:

> The Help America Vote Act (HAVA) was signed into law by the president on October 29, 2002. It creates **many mandates for state and local governments** and has provided funding. HAVA funding has allowed Michigan to replace outdated voting equipment and to improve polling place access for voters with disabilities. [Emphasis added].

The EAC website https://www.eac.gov/about_the_eac/help_america_vote_act.aspx provides the following description:

> The Help America Vote Act (HAVA) of 2002 was passed by the United States Congress to make sweeping reforms to the nation's voting process. HAVA addresses improvements to voting systems and voter access that were identified following the 2000 election.  **Read the Help America Vote Act of 2002**
>
> HAVA creates **new mandatory minimum standards** for states to follow in several key areas of election administration. The law provides funding to help states meet these new standards, replace voting systems and improve election administration. *HAVA also established the Election Assistance Commission (EAC) to assist the states regarding HAVA compliance* and to distribute HAVA funds to the states.
>
> *EAC is also charged with creating voting system guidelines and operating the federal government's first voting system certification program*. EAC is also responsible for maintaining the National Voter Registration form, conducting research, and administering a national clearinghouse on elections that includes shared practices, information for voters and other resources to improve elections. HAVA **requires that the states implement** the following new programs and procedures:
>
> - Provisional Voting
> - Voting Information
> - Updated and Upgraded Voting Equipment
> - Statewide Voter Registration Databases
> - Voter Identification Procedures

- Administrative Complaint Procedures

The method of 'encouraging' the states like Michigan to adopt the voluntary standards was to offer a rebate of tax money collected by the federal government from Michigan citizens if it would be spent on new 'electronic voting systems' that were in compliance with the voluntary standards which would be adopted into state law.[1]  This cash-for-compliance scheme resulted in Michigan passing the required provisions from 2012 to 2016 with an effective date in the laws AFTER the money was sent, receiving the money and implementing the acquisition and implementation of the voting systems.

Alas, Michigan began the process under a predecessor of the current Michigan Secretary of State. The standards however did not remain static once adopted and changed with the technology and security threats but the money was only there for the acquisition of the systems. It will be demonstrated that not only did Michigan adopt systems that failed to meet the standards AT THE TIME OF ACQUISITION, but that Michigan has failed to update to meet the evolving standards. This will be the subject of the underlying case.

THE EAC: What is their Role?

The US Election Assistance Commission (EAC)  is a federal agency. As an agency, the EAC has written rules they are supposed to follow. These rules are adopted under public scrutiny and are subject to many requirements of administrative law including notice of rule changes, publication, public comment, etc. The EAC has created some rules that are defined

> HAVA states that the Commission shall serve as a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of Federal elections.  EAC shall establish and maintain a clearinghouse of information available to the public on:

---

[1] HAVA in Section 253 Condition for receipt of Funds specifies the certification of compliance that was required by each state which included a plan for performance goals and measures and included requirements that the state would maintain the standards. The conditions re lengthy but mandatory upon receipt of funds.

- Voluntary guidance adopted by EAC regarding the following HAVA mandates: *voting system standards,* provisional voting and voting information requirements, computerized statewide voter registration list requirements and requirements for voters who register by mail.
- Information on the experiences of State and local governments in implementing the Voluntary Voting System Guidelines and in operating voting systems in general.
- ***Information relating to the testing, certification, decertification, and recertification of voting system hardware and software.***
- Information and training on the management of HAVA payments and grants.
- The Help America Vote College Program.
- EAC's responsibilities under the National Voter Registration Act of 1993 (NVRA) which includes the development and maintenance of the national voter registration form and biennial reports to Congress on the impact of NVRA on the administration of federal elections.
- Studies regarding election administration issues and other activities to promote the effective administration of Federal elections.
- Compilation of federal and state laws and procedures regarding election administration and voting.

The State Plan

The Federal Register with all the other states and territories published the original

Michigan plan on March 24, 2004, but then Secretary of State Terri Land submitted an amended

state plan dated September 27, 2005, which was published on November 9, 2005. There is no

evidence that this plan has been updated subsequently on the internet or readily accessible

records of the MI SOS or US EAC.  On page 31 of the State Plan, the document reads:

> IV. Voting System Guidelines and Processes How the State will adopt voting system guidelines and processes, which are consistent with the requirements of section 301. -- HAVA §254(a)(4)
> **Michigan has adopted legislation that mandates the implementation of a statewide, uniform voting system (PA 91 of 2002)**. **The voting system selected will meet the requirements of Section 301 of the Help America Vote Act,** including all accessibility requirements.

HAVA Section 301 Voting System Standards

In Section 301a (1) A that the voter be given an opportunity to verify the ballot is

recorded as the voter intended the votes to be cast before the ballot is counted, provided an

opportunity to correct with a replacement ballot especially when the person overvotes for a race as the electronic voting system is supposed to notify of the error. Section 301 (1)  B provides a compliance alternative with education and in Section 301 (1)  C is focused on privacy.

In Section 301a (2)  is entitled "Audit Capacity" which states plainly that "the voting system SHALL produce a record with an audit capacity for each system." BUT it goes on to say in subsection (i) "that the audit system SHALL produce a PERMANENT paper record with a manual audit capacity for each system" and in subsection (iii) "the paper record produced. . . SHALL be available as an official election record for any recount conducted with respect to any election in which the system is used.

It should be noted that in 2016, per the Michigan Secretary of State report dated December 7, 2016, there were 321 Precincts (10.5% of those examined) that were identified as not re-countable because of the lack of records, reconciliation of counts, or chain of custody of the election records and 128 out of 534 in Wayne County (24%). (Exhibit ___).

Per the Secretary of State on April 21, 2021 "Audits of the November 3, 2020 General Election" at page 8 stated:

> In November 2020, several jurisdictions completed their elections with a **substantial percentage of absent voter counting boards out of balance.** Conversely, there were relatively few in-person precincts out of balance. This change corresponded with the change in voting patterns between November 2016 and November 2020, when the percentage of votes cast absentee more than doubled.
>
> Precincts out of balance, whether in person or at absent voter counting boards, are typically the result of human error in making or retaining records on election day. They do not necessarily mean that ballots have been improperly counted or improperly tabulated. However, out-of-balance precincts have negative consequences for the ability to recount precincts if a recount is requested. **Out-of-balance precincts sometimes cannot be recounted under the Michigan Election Law**. Often they can—an out-of-balance precinct can still be recounted if the number of ballots in the ballot container matches the number of ballots tabulated according to the voting machine's tabulator tape—but this often is not determined until the recount begins.

Please be aware that the above REPORT came out four months after the Michigan Senate conducted a brief inquiry into the election. The Secretary of State as the election supervisor took more than 16 months to conduct and report its audits. There were essentially three types of audits conducted. A precinct procedural audit, a sample audit of the Absentee Counting Boards—which were "substantially out of balance" and a risk-limiting audit.  None of these addressed the 2018 State Constitutional requirement for ma statewide audit.

Therefore, many citizens have been demanding the right to check the "paper produced" the "election record", the "audit trail" and "the audit capacity" as defined by Michigan Law—but overwhelmingly have been met with resistance. The Secretary of State even provides sample language to assist clerks in denying FOIA language. This will be proven at trial. The lack of transparency while insisting that the election was free from significant fraud or corruption is not comprehendible.

Since it is clear that the standards of HAVA require certain records for the audit capacity be 'produced', the preliminary injunction merely requests these records be preserved. The ultimate question of the qualification of the voting systems REQUIRE these records be present to prove that they were produced by the systems as required by HAVA and adopted by Michigan Law in order to show that the voting systems meet the standards to qualify for future election based on past performance. Alternatively, the records (or lack or required records) will show that the certifications are genuine or worthless.

The voting system qualifications include an error rate of 1 per 125,000 ballot images are improperly reported in the cast vote record. The errors in tabulation in Antrim County in 2020 alone exceed the number of errors permissible in the entire 'gaggle' of Dominion machines much less Antrim County. Was the machine qualified? Error Rate is defined in HAVA in section

301a(5) and was mandated as demonstrated above into our standards for Michigan in PA 91 of 2002.

Section 301a (6) requires a uniform definition of what constitutes a vote. This definition includes much detail in the instruction about what is a "mark". Michigan law permits an election worker to discount a 'stray mark' but there is NO ADJUDICATION. To be clear, Michigan has no provision in our law passed by the legislature or by the Secretary of State purporting to pass a rule or guidance on adjudication of a mark….HOWEVER, the evidence in this case will include testimony from voting systems used in Detroit and other Absentee counting boards that there is a feature which allows two election workers (ostensibly a democrat and a republican) to decide what the voter's intent was by adjudication of the ballot. This ILLEGAL process is used repeatedly in Detroit for thousands of ballots with software that permits the election worker to OVERWRITE the ballot marks or alter by removing them from the optical images merely by agreement. Even more astounding, there is a button that will send the disputed ballot mark to the raised platform called 'quarantine" where someone outside the purview of a poll challenger has the right to alter the ballot image. This is a violation of the HAVA standards and the voting system software has this feature built in…I ask again…is the Voting system qualified under Michigan Law to conduct our elections?

Section 301b defines a voting system as governed by the federal standards incorporated into Michigan law.

**Voting system defined**

In this section, the term "voting system" means—
(1) the total combination of mechanical, electromechanical, or electronic equipment (including the software, firmware, and documentation required to program, control, and support the equipment) that is used—
    (A) to define ballots;
    (B) to cast and count votes;

(C) to report or display election results; and
(D) **to maintain and produce any audit trail information; _and_**

(2) the practices and **associated documentation** used—
(A) to identify system components and versions of such components;
(B) to test the system during its development and maintenance;
(C) to maintain records of system errors and defects;
(D) to determine specific system changes to be made to a system after the initial qualification of the system; and
(E) to make available any materials to the voter (such as notices, instructions, forms, or paper ballots).

The Voting system, therefore, includes the audit trail information and documentation which is contained in the audit and security logs which provide for access, maintenance and connectivity of the system.  The law is clear when read together that these logs should be printed into a paper record and kept as a permanent record (section 301a(2))

In conclusion, in the review of the federal standards adopted by Michigan Law related to voting systems and the creation and retention of the record, there is a requirement in the law. It would be hard for the Secretary of State to argue that these records of the Michigan Election system are not necessary to see whether the records were created and maintained as required by law. In fact, the voting records and audit trail are part of the electronic voting system.

## EAC: VSTL STANDARDS

The next area of inquiry is the Voting System Test Laboratory Standards or VSTL. The EAC describes VSTL Voting System Test Laboratories (VSTL) | U.S. Election Assistance Commission (eac.gov)

Section 231(b) of the **Help America Vote Act (HAVA) of 2002** (42 U.S.C. §15371(b)) requires that the EAC provide for the accreditation and revocation of accreditation of independent, non-federal laboratories qualified to test voting systems to Federal standards.  Generally, the EAC considers for accreditation those laboratories evaluated and recommend by the **National Institute of Standards and Technology** (NIST) pursuant to HAVA Section 231(b)(1).

However, consistent with HAVA Section 231(b)(2)(B), the Commission may also vote to accredit laboratories outside of those recommended by NIST upon publication of an explanation of the reason for any such accreditation.

In order to meet its statutory requirements under HAVA §15371(b), the EAC has developed the EAC's Voting System Test Laboratory Accreditation Program.  The procedural requirements of the program are established in the proposed information collection, the EAC **Voting System Test Laboratory Accreditation Program Manual**.  Although participation in the program is voluntary, **adherence to the program's procedural requirements is mandatory for participants**. The procedural requirements of this **Manual will supersede any** prior laboratory accreditation requirements issued by the EAC.  This manual shall be read in conjunction with the EAC's **Voting System Testing and Certification Program Manual** (OMB 3265-0019).

This is about accreditation. This is the authority granted by the EAC to a laboratory to test a system and provide a certificate that the voting system meets or exceeds minimum standards. The voting systems are certified by laboratories that are accredited.

Here are the rules of the accreditation. The procedural requirements are mandatory if a laboratory voluntarily participates. The Accreditation Program Manual (APM) supersedes prior accreditation requirements. The APM must be read in conjunction with the Certification Program Manual (CPM). This seems obvious that the accreditation means that the laboratory can apply the CPM to a voting system to test it for compliance before issuing a certification.

The Accreditation Program Manual (APM) Version 2.0

The Response by the Defendants attacked the claims that PRO V & V was not accredited as the plaintiff pled it was lapsed and defends the position on the fact that there was no "revocation" of accreditation.  While there is a process for revocation which was not alleged to have occurred nor is it required when an accreditation lapse…the more relevant inquiry is what does the APM say about the DURATION of an accreditation. Is it one time and good forever until revoked as the defendants assert or imply? Is it good for a period and then it must be renewed or it expires, lapse and becomes unaccredited as the Plaintiffs claim?

In Section 1.3 of the APM 2.0 it describes the role of NIST:

> 1.3. Role of the National Institute of Standards and Technology. Section 231(b) (1) of HAVA requires that the National Institute of Standards and Technology "conduct an evaluation of independent, non-federal laboratories and shall submit to the Commission a list of those laboratories…to be accredited…." **Additionally, HAVA Section 231(c) requires NIST to monitor and review the performance of EAC accredited laboratories.** NIST has chosen its National Voluntary Laboratory Accreditation Program (NVLAP) to carry out these duties. NVLAP conducts a review of applicant laboratories in order to provide a measure of confidence that such laboratories are capable of performing testing of voting systems to Federal standards. **Additionally, the NVLAP program monitors laboratories by requiring regular assessments. Laboratories are reviewed one year after their initial accreditation and biennially thereafter. The EAC has made NVLAP accreditation a requirement of its Laboratory Accreditation Program.** However, a NVLAP accreditation is not an EAC accreditation. EAC is the sole Federal authority for the accreditation and revocation of accreditation of Voting System Test Laboratories (VSTL).

In the highlighted areas of emphasis above it is clear working from the bottom up that the EAC has made the NVLAP accreditation a requirement its accreditation program. This is a pre-requisite. The NVLAP prerequisite is reviewed after one year and then biannually thereafter. At t his point the contents of the review is not discussed but the presence of the review after its one year of "initial accreditation" is clear that there is a one-year grant followed by two- year durations for the period of accreditation preconditioned upon an NVLAP having a 'measure of confidence that such laboratories are capable of performing testing of voting systems to Federal standards." Again, there is a review BEFORE renewal. Is this just s rule of the EAC? Nope..it a law passed by the legislature HAVA Section 231(c) which requires NIST to 'monitor and review the performance of EAC accredited laboratories."

In 2.1 a section that self describes, "This chapter lists the requirements of the EAC's Voting System Test Laboratory Program. **Adherence to these requirements is a condition of accreditation and a continuing obligation**. Failure to demonstrate compliance with the requirements of this chapter may result in the denial of an application for accreditation,

suspension of accreditation, or revocation of accreditation." This is immediately echoed in

Section 2.2 which provides:

> Program Requirements - Generally. In order to be considered for, receive, and **maintain** an **EAC accreditation** as a VSTL, laboratories must *demonstrate* **compliance** with the requirements of EAC's Voting System Test Laboratory Program.
>
> The program requirements are set forth in this Chapter. 2.2.1. Continuing Compliance Obligation. **VSTLs have a continuing obligation to meet the requirements set forth in this Chapter. VSTLs are required to maintain their compliance with the program's requirements as long as they hold an EAC accreditation.**

There is an affirmative obligation on the laboratory to MAINTAIN & DEMONSTRATE

Compliance. This requirement along with the initial one-year and subsequent two-year intervals

of accreditation COMPLETELY REFUTES the Assistant Attorney Generals' representation that

there is accreditation forever.

The EAC Accreditation process after a recommendation from NIST (or emergency

waiver) and commences with an application.

> 3.4. Application. EAC is the sole authority for Voting System Test Laboratory Accreditation. While NIST's recommendation serves as a reliable indication of potential technical competency**, the EAC must take additional steps to ensure that laboratory policies are in place regarding issues like conflict of interest, record maintenance, and financial stability.** It must also ensure that the candidate laboratory is willing and capable to work with EAC in its Certification Program. **To that end, applicant laboratories are required to submit a Letter of Application requesting accreditation**. The letter shall be addressed to the Testing and Certification Program Director and attach (in either hard copy or on CD/DVD) (1) all required information and documentation; (2) a signed letter of agreement; and (3) a signed certification of conditions and practices.

Other subparts of Rule 3.4 require current disclosures related to conflicts of interest, record

maintenance, and financial responsibility. There is parts to the application expressed in detail

throughout the subparts.  After the application is completed, then "the Program Director will

issue a recommendation to the Commissioners when forwarding any application package.

**Consistent with HAVA, a laboratory will receive an accreditation only upon a vote of the Commissioners."** APM Version 2.0 Section 3.5.

> 3.5.5. Vote by Commissioners. Upon receipt of an application package and recommendation from the Testing and Certification Program Director, the Chair of the Commission shall forward the information to each EAC Commissioner. After a reasonable time to review the forwarded materials, the Chair of the Commission shall bring the matter to a vote, consistent with the rules of the Commission. **The measure presented for a vote shall take the form of a written Commissioners' Decision which (1) makes a clear determination as to accreditation and (2) states the basis for the determination.**

There is no stealth grant of accreditation or renewal.

> Section 3.6. Grant of Accreditation. Upon a vote of the EAC Commissioners to accredit a laboratory, the Testing and Certification Program Director shall inform the laboratory of the decision, issue a Certificate of Accreditation and post information regarding the laboratory on the EAC Web site.
> 3.6.1. Certificate of Accreditation. A Certificate of Accreditation shall be issued to each laboratory accredited by vote of the Commissioners. **The certificate shall be signed by the Chair of the Commission** and state:
> 3.6.1.1. The name of the VSTL;
> 3.6.1.2. The scope of accreditation, by stating the Federal standard or standards to which the VSTL is competent to test;
> **3.6.1.3. The effective date of the certification, which <u>shall not exceed a period of two (2) years</u>; and**
> 3.6.1.4. The technical standards to which the laboratory was accredited.

ISSUE: The Pro V & V certification of 2015 is NOT signed by the chair of the commission.

Does this render this VSTL laboratory uncertified?

The claim that the certification is valid unless revoked was an intentional misleading of the plain statements of the APM version 2.0 which states that the effective date of certification <u>shall not exceed two years</u>…one year initial and then subsequent two-year periods. The plaintiffs were well within actual facts to argue that the accreditation lapses after two years.

> 3.7.1. Scope of Accreditation. A laboratory shall operate within the limits of the scope of **accreditation as stated on its Certificate of Accreditation**. 3.7.2. Representation. **No VSTL may make representations regarding its accreditation beyond its scope of accreditation.**

While the scope of accreditation is limited by the Certificate of Accreditation. This means that the accreditation is to the version of standards listed on the certificate and the duration is the time period specified. Any other representation is a violation of Section 3.7.2 in that the VSTL shall not represent any accreditation beyond the scope of the Certificate of Accreditation.

       3.8. Expiration and Renewal of Accreditation. A grant of accreditation is valid for a *period not to exceed two years.* **A VSTL's accreditation expires on the date annotated on the Certificate of Accreditation.**

VSTLs in good standing shall renew their accreditation by submitting an application package to the Program Director, consistent with the procedures of Section 3.4 of this Chapter, no earlier than 60 days before the accreditation expiration date and no later than 30 days before that date.

*Laboratories that timely file the renewal application* package shall retain their accreditation while the review and processing of their application is pending.

VSTLs in good standing shall also retain their accreditation should circumstances leave the EAC without a quorum to conduct the vote required under Section 3.5.5.

The expiration or lapsing of accreditation is expressed in plain language. **A VSTL's accreditation expires on the date annotated on the Certificate of Accreditation.** Section 3.8 goes on to require the Laboratory (WHO? The laboratory) to timely file a RENEWAL APPLICATION.

There are two exceptions to the rules that the accreditation expires (or lapsed). Both extensions of grace require a timely application to be pending and in process. Without the application being renewed then the application must start over with a NIST recommendation.

Further, the renewal process requires a new application package consistent with Section 3.4 which included CURRENT disclosures—fiscal, conflict of interest, and record maintenance. These disclosures MUST therefore be made every two years.

Chapter four deals with Compliance Monitoring and Chapter five deals with revocation. To make this simple, if I fail to renew my driver's license in Michigan and it is expired, I will be

subject to being charged with operating without a valid license. There is no excuse that I meant

to go to the SOS to renew my license. IT is very black and white. The accreditation was expired

and there was no application pending and therefore PRO V & V was not accredited. Period.

There is no need to explore their compliance or whether the EAC properly monitored the

VSTL. There is no need to explore revocation for NON-COMPLIANCE when there is no

accreditation, no current disclosures, no written certificate defining the scope and duration of the

accreditation. PRO V & V was not accredited.

Section 7 of the APM version 2.0 is refreshing in its declarations of transparency.

> The EAC seeks to make its Voting System Test Laboratory Program as transparent as
> possible. The agency believes that such action benefits the program by increasing public
> confidence in the process and creating a more informed and involved public. As such, it
> is the policy of the EAC to make all documents, or severable portions thereof, available
> to the public consistent with Federal law (e.g. Freedom of Information Act (FOIA) and
> the Trade Secrets Act).

Similar transparency related to election records would be most welcome and then there would

not have been the need for protective orders to prevent destruction.

All certifications issued by Pro V & V which lacked accreditation from 2017 to 2021

would be as stated in the complaint machines which were not certified by an accredited

laboratory and are therefore mere opinions of compliance. As Michigan law requires certification

by a VSTL to the current VVSG guidelines the machines were NOT qualified to run the 2020

election.

There remains a question as to whether the EAC could 'renew' an expired accreditation.

In short, is the 2021 accreditation valid when there appears to be no current NIST

recommendation that launched the process? Also when the certificate face in 2021 is to an

outdated standard is the voting system qualified to run the Michigan 2022 Midterm election?

Compliance with the accreditation process for the 2021 certificate of Pro V & V must still be scrutinized. The current standards of security and transparency must be met.

Plaintiffs have a high likelihood of prevailing on their merits that this court will declare that 24 Michigan counties lacked certification in 2020 for their voting systems and that it is required by law AND that other another 48 counties were purportedly 'certified' by Pro V & V but Pro V & V was not accredited. The issue of remedy is still open.

Plaintiff asks for three remedies: that the 2020 election be decertified and rerun; that records from 2020 be preserved, and that future elections not be run using voting systems that are either not certified *to the current VVSG standard* or certified by a VSTL that is not accredited. Regardless of whether the court determines the remedies are appropriate there is sufficient evidence that the underlying declaratory relief will be granted.

### The Testing and Certification Manual (CPM) version 2.0 (2015)

The CPM manual establishes the procedures used to certify a voting system. This was to be read in conjunction with the accreditation manual which is the procedural manual for the VSTL to be accredited while this manual defines the process required before a VSTL is issued a certificate of compliance or becomes certified. While the procedure has not been modified substantially and remains the same since version 2.0 of 2015 the actual standards for compliance are defined later in the VVSG. Starting in Section 1.3 it is clear that procedural  compliance is mandatory once participation is chosen and that this version is the only version as it superseded any other voting system requirements.

> 1.3. Scope. This Manual provides the procedural requirements of the EAC Voting System Testing and Certification Program. Although participation in the program is voluntary, adherence to the program's procedural requirements is mandatory for participants. The procedural requirements of this Manual supersede any prior voting system certification requirements issued by the EAC.

In Section 1 of the CPM there is the basic questions of this lawsuit: Is the voting system qualified

to be used in Michigan elections?  This is does the machine conform to the applicable

requirements of HAVA federal standards and Michigan law? The three questions of conformity

are the same questions this court MUST ask:

> 1.6.2.Conformity Assessment, Generally. **Conformity assessment is a system established to ensure a product or service meets the applicable requirements**. Many conformity assessment systems exist to protect the quality and ensure compliance with standards of products and services. All conformity assessment systems attempt to answer a variety of questions:
>
> **1.6.2.1. What specifications are required of an acceptable system**? For voting systems, the EAC Voluntary Voting System Guidelines (VVSG), Notice of Clarification and Request for Information address this issue. States and local jurisdictions also have supplementing standards.
>
> **1.6.2.2. How are systems tested against required specifications?** The EAC Voting System Testing and Certification Program is a central element of the larger conformity assessment system. The program, as set forth in this Manual, provides for the testing and certification of voting systems to identified versions of the VVSG. The Testing and Certification Program's purpose is to verify voting systems meet manufacturer specifications and the requirements of the VVSG.
>
> **1.6.2.3. Are the testing authorities qualified to make an accurate evaluation?** The EAC accredits VSTLs, after the National Institute of Standards and Technology (NIST) National Voluntary Lab Accreditation Program (NVLAP) has reviewed their technical competence and lab practices to ensure the test authorities are fully qualified. Furthermore, EAC technical experts review all test plans and test reports from accredited laboratories to ensure an accurate and complete evaluation. Many States provide similar reviews of laboratory reports.

In Chapter 3 the CPM 2.0 explains what certification means

> 3.2.3.Significance of an EAC Certification. An EAC certification is an official recognition that a voting system **(in a specific configuration or configurations)** has been tested by a VSTL to be in conformance with **an identified set** of Federal voting standards.

The certification certificate at issue in the Dominion was also that on information and

belief that the configuration that was certified differed from the configuration as used in

Michigan during the 2020 election. To be clear the certification by Dominion of a system with a

different software configuration is of ZERO value to Michigan. Likewise, the certification to

meet the requirements of an outdated federal voting standard is of little value to Michigan. It is amazing that the Assistant Attorney Generals claim that the voting systems were certified. I am left with this court to ask for simple evidence per manufacturer:

1) How was the voting system configured during the 2020 election? What was the software version and options selected by the state and manufacturer?

2) What were the current federal standards version in effect? For 2020 it was VVSG 1.1 (2009)

3) Was the configuration of the voting system tested against the current federal standards?

4) Was the person who ran the test accredited by the EAC as a VSTL?

When these basic questions are answered the issue of whether the declaratory relief will determine that the voting systems as configured in 2020 were not certified by an accredited VSTL to the current federal standards VVSG 1.1…Therefore the voting system was not qualified to do the job it was 'hired' to do.

After calling the certification and accreditation accurately then the question next will be what is the remedy…

Much of the CPM manual is not required to be repeated here. However, it should be noted that even the EAC has a process to decertify a system and has a whole chapter on when to decertify a system they have previously certified. Our lawsuit merely requests declaratory relief then once given that the court consider mandamus relief to decertify the election which was conucted with voting systems that were not qualified to conduct the election as well as prohibit their use in future elections.

## VVSG The Federal Guidelines for Certification

The Voluntary Voting System Guidelines have been through three editions. The VVSG 1.0 was a standard created in 2005 and was replaced by VVSG 1.1 which was in effect as of 2009. The newest standard is VVSG 2.0 which took effect in 2021.

Returning to the lawsuit, E S & S provides no evidence from the EAC which openly publishes any system that was certified by a VSTL on their website that they had a certification for any system to any standard—much less the systems as configured and used in Michigan 2020 and to the standard VVSG 1.1.

Dominion provides evidence that a system with a different software configuration was in possession of a certificate of accreditation to the outdated standard VVSG 1.0 which had been replaced in 2009. The VSTL that provided the certification had an 'expired' accreditation and was therefore not currently certified and had not filed required disclosures for its application as fiscally responsible (free from bribes); as keeping records required (transparent) and/or free from conflicts of interest (bias). Most importantly the voting system failed Michigan's " thou shall not use a voting system requirement" of MCL 168.765but was used illegally (in violation of statute). What percentage of county systems does this affect? 72 of 83. This scrutiny has not been leveled at the other 11 county systems but there is already an 86.7% rate by county of devices that were not qualified to run for the 2020 election. One system is too many…the Secretary of State is responsible for either misfeasance, malfeasance or nonfeasance.

The particulars of the guidelines are beyond the scope of this brief. However, they comply with chapter three of HAVA which has federal legal requirements. These were reviewed and attached will be all three versions of the VVSG.

Direct Reply to issues raised in the Defendant's brief

*The complaint does not define the "evidence" of the election material Plaintiff seeks to preserve.* The complaint clearly requests all data that was generated during the 2020 election material including the records related to the audit trail.  There is a federal records retention law that was set to expire 22 months after certification and state retention laws that expire after 24 months. The plaintiff requests that NO FURTHER 2020 election records be destroyed either paper or digital.

*Plaintiffs do not identify a duration.* The duration of the preliminary injunction would logically be during the pendency of this case or controversy and the permanent injunction would be identified at the conclusion of the trial. It should be noted that the cost of storage is very low for records that already exist while the risk of harm is very high. What is the reason for destruction of these items that people have been requesting to review in record numbers?

*Plaintiffs do not identify an investigation.* The lawsuit will have discovery. The investigations of the harm may become relevant when the court is considering remedy. I am certain the defendants will argue against redoing the 2020 election and one way to do that would be to count the ballots that were preserved by hand rather than by an unqualified voting system. Another objection will be that they will raise is that despite the fact that the machines were not properly certified that the plaintiff to obtain relief of decertification must show that the machines affected the outcome—beyond what was shown to change two contests in Antrim County, Michigan and despite the fact that the error rate for the dominion system as configured and used every where in the state had an acceptable error rate in violation of HAVA Section 301(1)(5).  I am certain that the argument will be that the affected ballots will have to exceed the margin of

victory. In order to have the ability to prove our case, the evidence must be preserved and investigated during discovery.

*The Plaintiff's complaint does not include any allegations that the 2020 general election results were inaccurate or fraudulent.* So here it is. The very next argument. The counting of ballots were entrusted to a voting system that was not certified as required by law. Once that is established the declaratory relief should be granted. The question of remedies will then be explored. However, if the election is not decertified on the threshold question of that it was conducted with voting systems in violation of Michigan Law, then why does the burden of showing an effect on the outcome fall on the Plaintiff rather than the Defendants producing the Audit trail and showing that the election was accurately counted despite the fact the machines were not qualified? And why does it have tot be fraud or an intentional bad actor standard instead of an incompetence or lack of qualifications that changed the course of history?

*The statutory Requirements of 168.795a.* The defendant agrees that the machines can not be used without compliance but asserts full compliance. The Plaintiff requests evidence of compliance with MCL 169.795a1. There is no such thing as an "independent testing authority accredited by the national board of state canvassers." Hence there is no compliance. There are also no "performance and test standards" that existed in 2020 for an independent testing authority to use the national board of state canvassers. Hence there is no compliance. Finally, there is no documentation proffered to even fulfill either of these alternatives. I do not see a certificate of accreditation of an independent testing laboratory approved by the national state board of canvassers. I do not see any standards that such an independent laboratory could use or in liew that a manufacture could promise they had fulfilled. In fact, I do not see any pledge or certification by the manufacture that they themselves declare they meet these standards.

*The certification [sic] of Pro V & V.* The defendants rely upon the letter of July 28, 2022 in which the Bureau of Elections ( a division of the Secretary of State) sent claiming that the claims related to Pro V & V not being accredited are not accurate. The letter which is a denial of the veracity of the claim is not evidence of accreditation. It is a self-serving lie at worst and very misleading at best. Let us look at the facts. Pro V & V was accredited on February 24, 2015 and the face of that accreditation states that it is good for 2 years.  This is then attached to a claim that Federal law provides that accreditation of a VSTL cannot be revoked unless there is a vote. The summary was that there was no vote to revoke. Finally the fact was added that a new accreditation was granted after the 2020 election on February 1, 2021.

This sting of true facts is misleading and deception. There has been no claim asserted as to revocation. The claim has been made of expiration. This was ignored and with a slight of hand the shift of focus misleads the reader away from the fact that the lapse in accreditation occurred in 2017 more than two years before the 2020 election. The footnote then referenced in the website claims to repudiate the carefully explained REQUIREMENTS of the procedural manuals and processes explored above with a claim that the lack of a certificate does not determine the accreditation or lack thereof. Again this is misleading. The lack of a certification certificate does not mean a VSTL that had applied (Pro V & V had not) would still be extended grace. The letter and footnote do not deal with the claim that expiration is loss of accreditation and revocation is not needed.

While it is clear that the EAC is now a co-conspirator in the cover-up and has issued statements that defy the rules they had carefully crafted lets examine the next big whopper. There was an audit in 2018. There was no audit in 2020. There is no problem. So this discussion relates to compliance checks on the VSTL's records as described as an audit. This has nothing to do

with the fact no application was made for re-accreditation and the accreditation is lapsed.
Imagine my birthday passes and my driver license expires. Imagine that I get caught driving and
I offer to prove that I have knowledge of how to drive. Does that mean I have a valid license?
…ridiculous. The question of what happens next as to a fine or jail may be determined on
whether it is still my birth month versus more than three years later or whether I was in accident
while driving. The remedy is separate from the wrongful act.

I would be remiss if I did not point out that the EAC cover-up does not change the fact
that HAVA and MICHIGAN LAW require certification of the system as configured to current
standards by an accredited laboratory—these are all 'elements' that the defendants have to prove
were present for the lawful use of the machines despite their efforts to shift the proof to the
Plaintiff to prove that they were not in compliance. The lack of accreditation certificate required
by their own rules might be embarrassing enough to cause a cover-up CYA letter but it does not
change the fact that from 2017 to 2020 there were many, many months before the pandemic
which is now the convenient scapegoat in which the problem remained unrectified.

## ARGUMENT

The Plaintiffs agree that the standard for the preliminary injunction issued is that there
must be a clear showing that (1) substantial likelihood on the merits at trial and (2) irreparable
injury if the defendant is not restrained. _Corning Glass Works_ v _Lady Cornella, Inc 305 F Supp_
_Mich 1969._

## LIKELIHOOD OF SUCCESS ON MERITS

What does success on the merits entail? The plaintiff asserts that the declaratory relief count
requests a determination that the voting system used in many counties in Michigan during the

2020 election were (1) not certified which included 24 counties (2) or not certified as the software was as configured in 48 counties (3) or were not certified by an accredited laboratory as the accreditation for Pro V & V had expired on its face three years before the election. The Plaintiffs further ask for the declaration that proper certification as configured to federal standards by an accredited VSTL is required by federal HAVA and Michigan Law.

At this point, there is a high degree of success in this claim. There are remedies which include mandamus and injunctive relief sought as a consequence for the use of machines that were not lawful. It is agreed that this is a mess—but one that can not be ignored or pretended it was not created by the failure of processes under the control of the Defendant Secretary of State which has led to the other tow defendants rubber stamping their certification instead of safeguarding the integrity of election processes.

There is no requirement for a showing that all remedies sought will be successful just that the claim of wrongdoing will be successful on its merits. Simple issue: was the voting system qualified? The plaintiff has a high degree of confidence that this cause of action will be determined to be successful.

STANDING

Defendant's did challenge standing which is a favorite tactic to dispose of cases they are adverse to but the Attorney General has inconsistently waived the standing objection when a friendly sue and settle strategy is brought by a political ally. In the present case. Standing must be challenged rather than addressing the merits. The amended complaint sets forth the unique harms that each of the plaintiffs suffered.

Specifically, the voters (all plaintiffs except EIF including Jason Ickes and Ken Beyer) who cast a ballot have been harmed when the voting system did not count ballots as cast as this

diluted their lawfully cast ballots. This standing is clear from the requirements of equal protection which provides an individual right to the voter to have the ballot counted as cast and not be diluted. The pleading of this harm is sufficient to establish standing.

Donna Brandenburg who is a statewide candidate in the 2022 election is seeking clarification for the use of machines and the certification requirements of the law before the 2022 election so that she can have a lawful election. She has a unique harm that requires resolution of this matter of law.

Election Integrity Fund and Force as a public interest non-profit has devoted itself to the understanding of how honest, fair and transparent lections are conducted. Likewise, the officers of the Macomb County Republican party are fully invested in that they and the members of their political party are the poll workers, challengers and watchers that work to safeguard Michigan elections.

Sharon Olson as a township clerk needs clarification on the conduct of future elections to dispatch her duties.

Collectively, this group of Plaintiffs address all standing issues that can be raised. The statue requires merely that a party be an "interested party" that has raised a violation of a statutory or constitutional provision. 28 USC Section 2201-2202.  It is permissible to have a representative without requiring a class action.  A stated purpose of this act is to resolve uncertainties that arise over the interpretation of statutory and constitutional issues. _Columbian Financial Corporation v Baninsure Incorporated_, 650 F3d 1372 (10th Cir 2011) (along with the cases cited therein).

The law of standing has its roots in Article III's case and controversy requirement. The U.S. Supreme Court has established a three-part test for standing. The "irreducible constitutional minimum of standing" requires the plaintiff to establish:

First ... an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent," not "conjectural" or "hypothetical." Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." _Lujan v. Defenders of Wildlife_, 504 U.S. 555, 560-61 (1992); _see also Summers,_ 555 U.S. at 493.

The injury in fact test. The Supreme Court has held that, to satisfy the injury in fact requirement, a party seeking to invoke the jurisdiction of a federal court must show three things: (1) "an invasion of a legally protected interest," (2) that is "concrete and particularized," and (3) "actual or imminent, not conjectural or hypothetical." _Spokeo, Inc. v. Robins_, 136 S. Ct. 1540, 1548 (2016) (quoting _Lujan v. Defenders of Wildlife_, 504 U.S. 555, 560 (1992)).

The injury in fact to Jason Ickes and Ken Beyer is from the violation of constitutional rights.  There rights like all voters of Michigan are impacted directly when the federal and state statutes that govern the right to the voting franchise are violated. This is especially when it infringes upon Equal Protection which requires that a person eligible to vote have access to the polls, that they have their ballot counted as cast and that their vote is not diluted. The equal protection clause also protects against arbitrary and capricious actions by the government (or other actors) when they either fail to adhere to a standard or act without a standard. The

safeguards that the are in both federal and state laws designed to ensure that a voting system is qualified and counts ballots is designed to prevent the harm that occurred where the election had outcomes which included persons who voted not having a ballot counted, people who were not residents had ballots cast in their name, and people who voted in person are recorded as voting by a ballot with a record showing that the ballot was sent and received despite their affidavits that this did not occur. The problems led many to search for answers and it was not long before inquires were made as to whether the Michigan SOS used voting systems that were certified by law. The failure to meet the standards of the law as it relates to the use of machines is a violation of the constitutional rights. This injury is real and rather than bring a class action it is properly brought by any citizen. The injury is to the equal protection rights of the citizens of Michigan who voted and have had the election determined by voting systems that have demonstrated error rates in excess of those permitted by federal law. This is an invasion of a legally protect constitutional interest. It is concrete and particularized. The mere fact that machines altered the outcomes in two contests in Antrim County in 2020 which were only corrected by hand count affected both the citizens of Antrim but all citizens of Michigan.  The equal protection recognizes the sanctity of the individual vote as the foundation of our freedom.  Finally, the injury is actual and not conjecture. There was injury when the unqualified voting system was used. The plaintiff would be a victim of misfeasance, malfeasance or nonfeasance as defined under Michigan Victim Rights Act and would have a claim for injury. A person may represent a class of persons in a declaratory action.

The injury in fact is also apparent to the Sharon Olson an election clerk who is required to make a call under MCL 169.798b as to whether use of the voting system is impracticable and if she is not guided by this court she is subject to prosecution or removal of duties. The injury in

fact is also apparent to Candidate Donna Brandenburg who as a person seeking office has speant significant resources of time and money and merely desires a clean resolution of the election that is fair, honest and transparent. The injury in fact is very apparent to the officers of the Macomb County Republican Party who have spent time and money supporting candidates and ballot proposals and who as representatives of election workers, poll watchers and poll challengers they have a concrete interest in understanding the lawful use of voting systems. Finally a public interest group that is focused on the issue of election integrity as a watch guard. These organizations have enjoyed standing in many cases when the controversy is directly related to their public interest.

There are statutory violations, federal and state, that affect each Plaintiff differently but all face actual injury with an election that is clouded with uncertainty. The letter of the SOS attached in their response was not generated or sent to address any litigant of this case. This court needs to make a call on the merits of whether the voting systems are required to be certified and what the consequences past, present and future of not being certified must be addressed.

The fairly traceable requirement. The injury must be traced to the action or inaction of the defendants. In the present case, an election was conducted by the Michigan Secretary of State as the supervising authority per MCL 168.31 and who has been directly required to implement the requirements of HAVA. The Board of State Canvassers had a clear duty in relation to both certification of the 2020 election as well as a statutory duty related to ensuring that MCL 168.795a and its requirements were met before the voting system could be used in Michigan. These duties were breached causing the real harm. The Governor has an obligation related to certification of the election. The people demand to know how their election was certified when the voting systems were not…. The injury is felt every time a bad policy or directive is issued

that affects the citizens and it can be traced not to a poor choice at the poll box by a majority but to a wall of smoke and mirrors that obscures the audit trail that will verify or destroy the voting systems. On that inquiry the fact that the voting systems were not qualified is a hard and bitter pill for the citizens, political parties, election clerks and candidates to swallow and is the gatekeeper before the election data is really examined…but alas the sands of time have run out and imminent destruction of election data that will answer many questions lies in the balance.

The third prong which is that there is likelihood that a favorable ruling will address the injury is met. A determination before 2022 on whether the machines as configured for the 2022 Midterms have been certified by an accredited VSTL to the current federal standard and if not whether the voting systems can be set aside will alleviate much injury. Further, a determination as to whether the voting systems were properly certified in 2020 will address many unresolved questions that has caused harm and the greatest post-election mobilization of citizens who feel directly and personally aggrieved by the failures of their local elections.

Therefore, all Plaintiffs have standing but collectively there is no legitimate way for this court to determine that this case or controversy should not be resolved. If access to this court is barred by standing for this collection of Plaintiffs then there is no effective judicial recourse to seek redress of grievances of the failures of our state officials. Likewise, it would be unfortunate to avoid the merits through legal artifice and leave this looming question to undermine public confidence in another elections and if the lack of confidence is well placed then the consequences should be resolved forthwith and further delay is untenable.

The defendants raise that the vote dilution or misreporting the votes will not be addressed by a favorable decision of the court—we as plaintiffs disagree as a new election with accurately counted votes by hand or by certified machines that are safe and secure as configured to current

federal standards would properly record the votes as cast. There is redressability but it requires

an extraordinary but lawful remedy.

It is shocking that the defendants argue that there is no ability to redress the imporper

certification of an election. There is the remedy of decertification. There does not need to be a

change of electoral votes but a voiding of them. What congress does or does not do with a

decertification of Michigan's electoral votes is not up to this court to decide or worry about. The

decertification is the remedy and only when and if there is too few votes to sustain the current

administration a new election can be ordered. Please note that in other countries they will have

multiple governments formed and dissolved in one year including stable free countries like

Britain, Canada and Israel. The claim there is no remedy available on one hand but that the

remedy is too extreme on the other is an inherent contradiction.

LATCHES

The second claim to raise a barrier in front of addressing the clear problem with the

unqualified voting systems raised is latches.  Latches are wholly inapplicable to declaratory

actions. This is a question that may bar the decertification remedy or the requirement that the

past electin be conducted but it has no bearing on the issue of the case or controversy as to

whether the election voting systems in Michigan were lawfully used. This is another attempt to

avoid discussion on the merits of an election law case.

Latches requires an unreasonable delay. This equitable claim also provides a stalling and

delaying action as an incentive from those who hold the data and not provided it with an open

and transparent process. Let us review the timeline. January 20, 2020, the new administration

enters office. Simultaneously due to term limits, most of the Michigan legislative leadership has

left or at least changed chambers. There is a brief hearing in the Michigan Senate which is

heralded as the end of the inquiry by those who without evidence to support claim this was the

most secure election ever---many of these parrots who have online clips claiming election fraud

in 2016 altered the outcome.

       Throughout 2020 and into late summer of 2021 there is a pandemic raging and people are

under orders in this state to remain inside, six feet away and cover your mouth in public. No

meaningful investigation is being done. People have questions but significant worries. There is

online suppression of political speech and threats of prosecution or persecution to those who dare

ask questions. Slowly, neighbors ask neighbors. People get together and talk starting in the late

summer of 2021 when the emergency orders in Michigan are lifted. Meanwhile an election roll

or QVF is made available—it should be noted that a FOIA to the Michigan Secretary of State to

identify all voters went unanswered until a few weeks ago by the Patrick Colbeck.  A few polls

books called the QVF emerge. Citizens start asking their neighbors and comparing the QVF

voting history to the neighbors reports and the problems begin to surface.

       During this time people asking for election data are stalled in the FOIA process or priced

out of information necessary to investigate the audit trail. A fuzzy picture begins to emerge.

There are new elections on August 2, 2022 in Michigan problems were observed in real time but

this time the citizens had some idea of what they were observing. Groups raised up and began to

accumulate the stories. The national news media and many local outlets continue to say its

insurrection to question the election. When does the information become available? There were

many questions but the lawsuit in the present case was not sitting dormant for months or weeks.

A team of lawyers put it together as soon as the data was understood and available as to the

astounding lack of certification of the voting systems. Where is the unreasonable delay? There is

time to make a determination. The Michigan Election code has a provisions for hand counting

ballots (MCL 168.798c) without the electronic voting systems—after all there were hand counts going on in Michigan in 2005 per then SOS Terry Land in her HAVA State Plan attached and discussed above. There is no equitable delay to justify not deciding this case on its merits. As to whether latches would bar the decertification remedy that is contrary to common law quo warranto actions that could change office up to the last day if wrongfully held.

The claim that there was delay caused by the Plaintiff failing to advance the claim is contradicted by the fact the controversy was first addressed by the Michigan SOS in their July 28, 2022 letter which is a mere forty days before the lawsuit was filed. The defendants then argue prejudice. Talk about lack of standing to raise prejudice. Let us first talk about unclean hands. The Michigan SOS has been in office since 2018 and had two full years to rectify the certification and accreditation issues. Instead of parroting about how safe and secure Michigan elections were in 2020 even after their own limited audit revealed that every Absentee Counting Board would not reconcile and that the error rates of the voting systems violate federal law, the Michigan Secretary of State should have been transparent with election data and cooperated with reviewing the audit trail as though there is nothing to hide.

The SOS lacks standing to steal the prejudice of a candidate who was wrongfully elected having committed resources and making decisions to prevent fixing the underlying wrongful election. The claim that the lawsuit was brought "years" after he fact is an exaggeration as it has not even been two years from the inauguration of the President. The fact that persons have taken office and created policy that was not lawfully elected should have been addressed by the MI SOS or the Board of State Canvassers doing their job rather than citizen sleuths who have pieced together the election from incomplete records. In short, is there going to be evidence that the SOS knew about this lack of accreditation or missing certifications and chose silence hoping that

nobody would notice and knowing that when it was brought to light they could claim delay and latches and prejudice?

Please be aware that the request for relief was merely the presidential 2020 and did not include all the state and local offices which are enumerated as incumbents on the election scheduled for November 8, 2022. Some of those will have nearly completed their terms. Instead, the lawsuits retroactive relief is merely decertification of one election the Presidential Election which was certified by the governor and the board of canvassers. The other elections are outside of the scope of the relief sought. The printed ballots can be used but there should just be hand counting or a voting system that has been certified as configured with its hardware and software to VVSG 2.0 by an accredited VSTL used to count the ballots.

EQUAL PROTECTION CLAIM REPLY

The Defendant's assert that the equal protection claim fails. The claim underlies the declaratory relief and the right is individual to voters as established in _Bush v Gore_, 531 US 107 (2000) in which the three rights which include the right to have the vote counted as cast did not require a protected class. Furthermore, state action that fails to meet a standard or in the absence of a standard is arbitrary and capricious and as such violates equal protection even without discriminatory intent.

The defendants cite _Bognet v Secretary Commonwealth of PA_, 980 F rd 336 (3d Cir 2020) vacated as moot _Bognet v Degraffenreid_, 141 S Ct 2508, 209 Led 2d 544 (2021) on vote dilution. Now let us look at the real claim asserted is a different equal protection right and that is to have the vote counted as cast. In fact, Section 301(1) of the Help America Vote Act and the EAC have determined that the voting system error rate shall not exceed 1 per 125,000 ballots read. In Michigan the acceptable voting system error rate would be 5,570,000 ballots divided by

125,000 or 45 ballots. Let that sink in. The federal due process standard for error would permit the machine to make a mere 45 errors in the state of Michigan in interpreting ballots. There were more errors by the machine configuration in Antrim County then would be permitted in all the swing states and that was one precinct in one rural county.  Now when there is discussion of mathematical errors please remember that there is a federal standard. Equal protection requires the vote be counted as cast.

It is agreed that the Constitution is not an election fraud statute—but it does guarantee individual liberty to citizens who have standing to redress when the government violates its own standards. In the case at bar, there are federal standards that are required by federal statute and by state statute to ensure that the voting system is qualified and the key person entrusted to ensure this was Joceyln Benson the Michigan Secretary of State and the board of State Canvassers which is supposed to be a check and balance also failed the citizens of Michigan. The governor then certified the results as an empty rubber stamp without checking to see if the basic requirements of lawful use of voting systems had been complied with.

The Plaintiffs did not assert a a claim under 50 USC 20701 rather the statute was cited as the urgency and the irreparable harm that when the sands of time ran out then the election data was no longer secured. There was no claim for remedy under this statute but a recognition that the harm would occur when this statute of 22 months of record retention expired and there was no restraint on the destruction of election data.

The Defendants claim that clerks rather than the SOS retain election records. This defies the fact that the Michigan Secretary of State sent out an "instruction" to all clerks to delete the August 2, 2022 thumb drives which contained election data on or about August 9, 2022 and told them if they failed to do so they would be subject top prosecution for failure to obey the

instruction. The SOS could have just as easily issued an instruction to preserve the daa or prolong the timeline. This argument is spurious.

11th Amendment

The Defendants claim the lawsuit is barred by the 11th Amendment. The declaratory relief sought is by statute which permits the federal court to interpret the federal constitution, the federal HAVA and the EAC Rules and state laws related to the inclusion of these standards into the state election code. The 11th Amendment does not preclude declaratory relief, injunctive relief or mandamus relief.  Further research will be necessary should a proper motion to dismiss be brought as to money damages it is outside the scope of succeeding on the merits as to the basic claims and format of the lawsuit,

The Defendants claim that the Plaintiffs do not seek to have the officials conform their conduct in the future and this is flat out misstating the claims. The ongoing use of the voting systems is part of the relief sought to be enjoined. Likewise, the claim that the federal question is predicated on Michigan law defies the Equal Protection Claim, the requirements of the Federal Statute HAVA and the fact that the 2020 election is a federal election of the US President while future elections including the 2022 Midterm involve federal candidates. The mere fact that the HAVA law was incorporated into Michigan Law does not change this from a federal question.

## Irreparable Harm

The factor related to the irreparable harm is best examined from the preservation of the status quo.  Currently the election data generated during the 2020 election is available. The Secretary of State disavows any ownership of responsibility and states it is merely the clerks but this defies the duties set forth in Michigan Law as cited above. The data can be stored but it can not be replaced. On balance, there is greater harm to the public interest in following the audit

trail of the 2020 election to learn and inform future elections and our choices at the ballot boxes and the threat and risk assessments against our election system with the unrestrained loss of this data. It is amazing how much has already been destroyed but alas there is no standing to raise the failure to protect to federal standards and there is no confidence that the defendant's counsel who has standing as Michigan Attorney General will but there is the power in protecting the data within this case or controversy as it will likely include a determination of whether as asserted a mathematical probability or if there was systemic failure of the voting systems.

There is zero public harm in preserving the data and significant and irreparable harm once the data is lost from intentional purging of records or from writing over electronic storage. The Controversy in this case exceeds the declaratory relief and this court may want to know more about the error rates and lack of audit trails before deciding what relief to grant after decertification—but once the disk are wiped and the papers shredded there is no return of the election data.

The harm is imminent as the restraint on destruction is ending after 22 months federal and 24 months for state. Also there is not a complete audit trail with the documents and without the logs. If this court really wanted to expose the election then thee court should examine the amount and types of data that has already been lost, misplaced or unpreserved and understand how instead of a transparent election Michigan has an opaque one. One example is that generated ballot images are not saved and lost immediately and this breaks the required audit trail. This machine setting was done to save the storage space and to speed the counting of votes to justify its blatant violation of federal law.

The Injunction to the Secretary of State also would have teeth even if the Secretary of State were not already 'instructing' clerks on data preservation and destruction. The Election

Management System used by the Secretary of State to accumulate vote totals and report to the

media has significant election records that were generated including the configuration of each

tabulator and all security and access logs that unrestrained and purged will be the greatest

destruction of election evidence that is relevant to 2020.

## CONCLUSION

The Plaintiffs request this Honorable Court to immediately enter a

preliminary injunction as the plaintiff has demonstrated a high likelihood of success to

obatin declaratory relief and there are other remedies that will require this court to

consider evidence that will be lost if not preserved during the pendency of this case. In

the event that the Court desires oral arguments or wishes to schedule an expediated

hearing, the Plaintiff requests that the court also enter the preliminary injunction as to the

use of the voting systems without being certified as configured and to the standards of

VVSG 2.0 by an accredited VSTL.

Respectfully submitted this 26th day of September 2022.

/s/Daniel J. Hartman

Daniel J. Hartman (P52632)
Law Office of Daniel J. Hartman
Attorney for Plaintiffs
PO BOX 307
Petoskey, MI 49770
(231) 348-5100
Danjh1234@yahoo.com